IVY W. CROSBY, as Administratrix of the Estate of JESSE CROSBY, Deceased,

*Plaintiff and Respondent*

vs.

Estate of L. S. Strahan (also known as Leonard S. Strahan) Deceased, A. E. Longfellow, as Executor of the Estate of L. S. Strahan (also known as Leonard S. Strahan) Deceased,

*Defendant and Appellant*

Carter Oil Company, Minnelusa Oil Corporation,

*Defendants.*

(No. 2811; April 15th, 1958; 324 Pac. (2d) 492)

304

For the defendant and appellant the cause was submitted upon the brief of Bowman and Bowman of Lovell, Wyoming, and oral argument by Robert B. Bowman.

For the plaintiff and respondent the cause was submitted upon the brief and also oral argument of Thomas M. McKinney of Basin, Wyoming, C. R. Harkins of Worland, Wyoming, and Carroll Dunnum of Los Angeles, California.

Heard before Blume, C. J. and Harnsberger and Parker, JJ.

## OPINION

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an action for specific performance as hereafter mentioned. Jesse Crosby, referred to herein as

Crosby, died on August 20, 1952. Ivy W. Crosby, his widow, is administratrix of his estate, is the plaintiff herein, and is generally referred to herein as the plaintiff. L. S. Strahan, also known as Leonard S. Strahan, hereinafter referred to as Strahan, died on December 25, 1953, in Big Horn County, Wyoming; and A. E. Longfellow is the executor of his estate and is defendant herein. The Carter Oil Company was made a party defendant herein because of the ownership of the oil interests aside from that owned by Strahan, and the briefs herein do not concern themselves with this defendant, and we need not make any particular reference to that defendant hereafter. On May 22, 1937, Strahan acquired a 1% royalty interest in the so-called Johnson Watson lease, comprising lots 6 and 7, E½SW¼ and SE¼, sec. 6, all of sec. 8, all of sec. 18, T. 57 N., R. 99W, all of sec. 12, and the N½, sec. 14, T. 57 N., R. 100W, containing 2542.48 acres more or less.

The action herein is one to specifically perform an oral contract entered into between Strahan and Crosby for ½ of the 1% royalty interest owned by Strahan in the above-entitled property and for an accounting of the income therefrom. The consideration for that as alleged is substantially to this effect: Strahan offered to assign to Jesse Crosby ½ of 1% interest of Strahan in the above lease in consideration of Crosby's accompanying Strahan to Powell, Wyoming, and aiding Strahan in establishing the interest of Strahan in the aforesaid oil lease; Jesse Crosby accepted that offer, accompanied Strahan to Powell, Wyoming, testified on behalf of Strahan, otherwise aided Strahan to establish Strahan's interest therein, and fully performed all of the conditions on his part to be performed. That is the substance of the plaintiff's petition herein, and it is not necessary to set out the pleadings of plaintiff any further. The claim of plain-

tiff was filed in the matter of the estate of L. S. Strahan on December 4, 1954. The defendant, executor of the estate, in addition to generally denying the validity of the claim of the plaintiff, also contended that the action herein is barred by the statute of limitations, and that it is unenforceable by reason of the statute of frauds.

In order that there may be no misunderstanding, we have deemed it best to set out in detail the claim of the plaintiff herein.

The testimony as to the contract claimed by the plaintiff and the admissions in connection therewith are as follows:

Mrs. Ivy W. Crosby, widow of Jesse Crosby and administratrix of his estate, testified in substance as follows:

In the fall of 1943 Strahan came to my husband and said, "Jess, I'm in a pickle. I have this lease from Mr. Johnson in the Elk Basin [oil] field. I've written that out as a percent and not a royalty. Jess, you know, you were with me and you know that was supposed to be a royalty. Will you help me?" And he mentioned that he had to clarify Mrs. Davis' lease at the same time. So Jesse said, "I'll help you", and Strahan said, "I'll tell you, Jess, if you will, I'll give you one-half of what I can save from my 1%. If I can save a full 1% royalty, I'll give you half of that. Will you go with me?" My husband said, "I'll be ready to go tomorrow." They went and they were gone all day. When they came back Strahan and my husband sat down in the living room and talked, and my husband said, "Now, Leonard, there's no better time than right now to make me that ½ of 1% on this Johnson lease." Strahan said, "Jess, maybe I'd better wait until the

Carter [oil company] recognizes this as a 1%. If they'll recognize this as a royalty now that Mr. Johnson has declared the royalty, then I'll give you half of that." Well, then, it went on to 1944 and my husband then asked Strahan, "Leonard, when are you going to make that royalty to me? You know you haven't done it yet and that Johnson Watson lease is going to get drilled out the first thing you know, and it's a lot easier to part with royalty before it starts to pay money." Strahan said, "I know that, Jess, and I'll get that done." In January 1945 Strahan told my husband that he would get at making out a deed for the ½% royalty. Strahan said for my husband to wait, that he was busy every day at that time. I [the witness] went to Strahan's office and asked him if he would please make out this royalty and take it down to him [the witness' husband]. After my husband died, about two or three weeks after that, Strahan stopped in to my house and I said to him that I was sorry that he hadn't fulfilled his promise. Strahan said that he was very sorry that he hadn't gotten down and said, "I promise you, Mrs. Crosby, as soon as I get back from"—I think he was going to Washington on an Indian deal up to the Northwest—"I'll get that taken care of." In the early part of December 1953 I went to Mr. Strahan's office and he was very ill, and I asked him if he had that paper made out on the Johnson lease, and he said, "No, not yet, but I'll get at it." It was not long after that when he died.

The witness Charles F. Welch testified in substance as follows:

Sometime in 1943 or 1944 Strahan was interested in Mr. Crosby's going to Powell to help him bring to a head this 1%, whether it was a royalty or a working interest. Mr. Strahan was worried as to whether it was one or the other. If it was a working interest, he

would have to contribute to the work that was done. He told Jesse that if he would go to Powell with him and see this man and get that straightened out he would give him a part of his interest, 50% of what interest Mr. Strahan had. He stated that he had a 1% interest. Mr. Crosby replied that he would go with him and help him out if he could. A month or six weeks or two months later I overheard Mr. Crosby and Mr. Strahan talking as to whether or not Strahan would make out that part interest to him [Mr. Crosby]. As I remember, Mr. Crosby asked Mr. Strahan if he wouldn't make him out that 50% of his royalty there as a deed so that he could have it recorded. He said it would be a lot easier to fix out then than it would be after. Mr. Strahan said, "I'll take care of it, Jess, and see that it's fixed up." At a later time I heard a conversation between Mr. Crosby and Mr. Strahan. Mr. Crosby said that he would like to have this thing straightened out, this royalty business, that it had run long enough and "I don't know what this is going to do to me." He said, "Would you fix that up for us so that we would have it?" Mr. Strahan said that he would take care of it and he apologized for not doing it.

The witness Rodney W. Crosby, son of Jesse, testified in substance as follows:

On January 11, 1945, Strahan was present in the house of Jesse Crosby. My father asked Mr. Strahan if he wouldn't transfer ½% in the Johnson Watson lease that he figured he had earned, and Mr. Strahan answered that he would take care of it. I heard about the same conversation once a week for the next three or four months.

The witness Ruth A. Davis testified in this connection that Strahan said to her that he would have to

have an affidavit from Mr. Johnson in connection with the royalty of 1%; that he would contact Mr. Johnson and get the affidavit; that for a consideration Mr. Crosby would swear that the deed was correct and as it should be; and that was just a boner on his [Mr. Strahan's] part that kept it from being correct.

The witness Betty C. Meeks, a daughter of Jesse Crosby, testified in substance as follows:

I heard a conversation between Strahan and my father in my father's home. My father said to Mr. Strahan, "Well, Len, I would surely appreciate it if you would get those papers made out on the Johnson Watson lease. I feel that this is coming to me and I would like to have those papers made out." Mr. Strahan said that he was on the way to Billings and that he would see what he could do about fixing them up when he returned. I heard another conversation between my father and Strahan in August 1945. My father said, "Len, if you would just see that those papers are made out to me, that would be one of the most important things you could do for me." Mr. Strahan stated that he was busy with other affairs and that he was on his way to Billings to catch a plane for somewhere and that he would see that they were made out upon his return. In April or May 1946, my father said to Strahan, "Strahan, have you made out the papers on the Johnson Watson lease to me yet? I feel like we're letting this thing go by, and something needs to be done." Mr. Strahan said that he was leaving soon for Washington and that upon his return he would see if he could get the papers made out. My father said, "Well, I'm sure you will sometime, Len, as soon as you get back."

Theodore P. Strahan, son of Leonard S. Strahan, testified in substance as follows:

Sometime during 1943 or 1944 I heard my father and Mr. Crosby arguing. Mr. Crosby wanted to know when my father was going to give him his half of the old Johnson Watson lease. My father said as soon as he got back from a trip. Mr. Crosby said, "Well, you've been saying that for quite awhile." Other conversations to the same effect were had between the two. On December 24, 1953, I was in my father's office in Lovell, Wyoming. During our discussion, my father mentioned the fact that he had to take care of some things with Mrs. Crosby and among other things he had to make sure that she got her half of the Johnson Watson lease. He said that he hadn't done right by her and that he should have taken care of it years before.

It is apparent from the testimony of Mrs. Crosby that the contract is based upon a one day's trip made by Strahan and Crosby to the town of Powell, a comparatively short distance from where Jesse Crosby lived, for it appears that Crosby asked for the $\frac{1}{2}\%$ royalty interest immediately after returning from Powell on the same date. We might mention incidentally that the reason that Strahan wanted Crosby to go with him was because of the uncertainty as to whether Strahan had a 1% working interest or a 1% royalty interest. But, as a matter of fact, according to the only testimony in this case, that question was never raised when the parties arrived in Powell. Edward J. Johnson testified as follows:

"Q Do you recall, Mr. Johnson, as to whether or not, when these men came to your place, any question was raised as to the nature and character of the interest that you had conveyed by these instruments? * * * A I don't know whether it was raised or not. But if it was, I said I never sold anything but royalty. Q You told them you never sold anything but royalty at that time? A Yes. Q Well, then, was the question raised

at that time as to whether it was a royalty or a working interest? A I don't think it was."

We shall not base our decision on that point.

The trial court entered judgment for specific performance and ordered that an accounting be had of the money which had been received by Strahan from the ½ of 1% interest since the date that the contract was made and that the amount found due should be paid to the plaintiff in this case. From that judgment the defendant has appealed to this court.

As heretofore mentioned, the defendant contends that the contract above mentioned in unenforceable by reason of our statute of frauds. Section 5-101, W.C.S. 1945, reads as follows:

"In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:

\*    \*    \*    \*    \*

"Fifth—Every agreement or contract for the sale of real estate, or the lease thereof, for more than one year;"

The parties seem to be agreed that the interest involved herein is an interest in real estate. It was said in the case of Newman v. Newman, 103 Ohio St. 230, 133 N.E. 70, 74, 18 A.L.R. 1089:

"The statute of frauds is founded in wisdom, and has been justified by long experience. As was said by Mr. Justice Grier in Purcell v. Miner, 4 Wall. 513, 517 (18 L.Ed. 435):

"The statute is 'absolutely necessary to preserve the title to real property from the chances, the uncertain-

ty, and the fraud attending the admission of parol testimony.'

"It should be enforced. * * *"

In Bennett v. Harrison, 115 Minn. 342, 132 N.W. 309, 314, 37 L.R.A.N.S. 521, the court stated:

"It is unnecessary to discuss the wisdom of the legislation requiring contracts for a transfer of real property to be in writing. The statute of frauds expresses the fixed legislative policy of the state, and the court should not, by the extension of any equitable doctrine beyond established limits, interfere with such legislative policy. * * *"

With some exceptions, equity as well as the law is bound by the statute of frauds. 12 Cal. Jur., 1923, 934; 37 C.J.S. Statute of Frauds §232, p. 733. The tendency has been to restrict rather than enlarge and multiply the cases of exceptions to the statute, and the courts should not be tempted to turn aside from its plain provisions merely because of the hardship of the particular case. 49 Am.Jur. Statute of Frauds § 533, pp. 832, 833.

Counsel for plaintiff however contend that the defendant is estopped from setting up the statute of frauds. They have cited a number of cases, the facts of which are not like those in this case. None of them are inconsistent with the conclusion herein reached nor inconsistent with the principles herein discussed. Counsel have not given sufficient consideration to two well-established rules or principles of law which are controlling herein. The first of these rules or principles is the fact that a mere failure or refusal to carry out an oral contract within the statute of frauds does not take the case out of that statute. Thus it is said in 49 Am.Jur. Statute of Frauds § 580, p. 887:

"* * * it is clear that the mere breach or violation of an oral agreement which is within the statute of frauds, by one of the parties thereto, or his mere denial of an agreement or refusal to perform it, is not of itself a fraud either in equity or at law from which the courts will give relief or which will enable the other party to assert rights and defenses based on the contract. If it were, the statute of frauds would be rendered vain and nugatory. The mere nonperformance of an oral contract, within the statute which is pleaded, where no relation of trust and confidence exists, does not constitute fraud authorizing the interposition of a court of equity. * * *"

So in 49 Am.Jur. Statute of Frauds § 583, p. 891, it is said:

"* * * It is clear, however, that an estoppel to assert the statute of frauds does not arise merely because an oral contract within the statute has been acted upon by the promisee and not performed by the promisor. Neither does an estoppel arise upon the mere refusal to make a writing as agreed. * * *"

That the mere refusal or nonperformance of a parol agreement is not such fraud as takes the case of the statute has been stated in many cases. Watson v. Erb, 33 Ohio St. 35, 48; Crabill v. Marsh, 38 Ohio St. 331, 338; Newman v. Newman, supra; Long v. Long, 162 Cal. 427, 122 P. 1077; Seymour v. Oelrichs, 156 Cal. 782 106 P. 88, 95, 134 Am.St..Rep. 154; Easton v. Wycoff, 4 Utah 2d 386, 295 P.2d 332. See also 37 C. J.S. Statute of Frauds § 247, p. 755, n. 27. Numerous other cases are cited in 27 C.J. 341, n. 80, where it is said:

"* * * In order to justify the exercise of equitable jurisdiction, the fraud complained of must be something more than the mere refusal of a party to perform his agreement; either party has the right to refuse to execute a parol contract within the operation of the sta-

tute, and the exercise of that right is no more a fraud than a breach of any other contract. * * *"

And so it is said in 1 Perry, Trusts and Trustees, 7th ed., p. 378:

"* * * the mere breach of a parol agreement will not create a constructive trust in such cases * * *"

We now pass to the second rule of law involved. As stated above, the promisee of an oral contract within the statute of frauds must show more than the mere nonperformance of an oral contract. The doctrine of estoppel in pais is to prevent injury arising from actions or declarations which have been acted on in good faith and which it would be inequitable to permit the party to retract. Hefner v. Vandolah, 57 Ill. 520, 524, 11 Am.Rep. 39. Not every trivial injury will invoke the doctrine of estoppel. The promisee of an oral contract, in order to be able to rely on the doctrine of estoppel, must be able to show that he has changed his position substantially for the worse and that he has incurred unjust and unconscionable injury and loss. Thus it is said in 49 Am.Jur. Statute of Frauds § 583, p. 890, as follows:

"* * * The party asserting the estoppel must, however, show affirmatively that he has done or omitted some act or changed his position to his prejudice in reliance upon the acts, conduct—active or passive—language, or representations of the person sought to be estopped which he would not have done except for such acts, language, or conduct. One of the primary considerations is the fact that by reason of the failure of the other party to carry out the contract, the party asserting the estoppel suffers the infliction of an unjust and unconscionable injury and loss. * * *"

In a note on the doctrine of estoppel, 134 Am.St.Rep. 172, 177, it is said:

"No less important a constituent of the right to set up

an estoppel in pais is the fact, in addition to all others, that the party alleging injury must show that the attempted repudiation would work him injury. * * * if his conduct or acts of encouragement induced the other party to change his position so that he will be pecuniarily prejudiced by the assertion of such adversary claim."

As has been stated otherwise in Easton v. Wycoff, 4 Utah 2d 386, 295 P.2d 332, 334, quoting B.F.C. Morris Co. v. Mason, 171 Okl. 589, 39 P.2d 1, 43 P.2d 401:

" 'It is an indispensable element of equitable estoppel that the person relying thereon must have been induced to act or alter his position to his detriment or injury, and, where equitable estoppel is relied on to preclude another from asserting the statute of frauds as a defense to an oral contract not to be performed within a year, *such injury must be unjust and unconscionable, and* such that there is no complete and adequate remedy at law available to the person asserting the equitable estoppel.' "

And in St. Louis Trading Co. v. Barr, 168 Okl. 184, 32 P.2d 293, 295, it is said:

"* * * The very essence of equitable estoppel is the resulting prejudice to the party who invokes the doctrine. * * *"

Similar in effect are the following cases: Greenwood v. Commercial National Bank of Peoria, 7 Ill. 2d 436, 130 N.E. 2d 753; Linder v. Potier, 409 Ill. 407, 100 N.E.2d 602, 604; Yager v. Lyon, 337 Ill. 271, 169 N.E. 222; Kingston v. Colburn, 139 Cal.App.2d 623, 293 P.2d 805; Newman v. Newman, supra; Seymour v. Oelrichs, supra; Glass v. Hulbert, 102 Mass. 24, 35, 3 Am.Rep. 418; Kibbey v. Kinney, 25 Ariz. 427, 218 P. 984; Foley & Whitehill v. Texas Co., Tex.Civ. App., 252 S.W. 566; Goldstein v. McNeil, 122 Cal.App.2d 608, 265 P.2d 113; Augustine v. Trucco, 124 Cal.App.

2d 229, 268 P.2d 780. See also Browne on the Statute of Frauds, 4th ed., § 457 a. It is upon the foregoing rule or principle that we decided the case of Vogel v. Shaw, 42 Wyo. 333, 294 P. 687, 75 A.L.R. 639.

The fundamental purpose of an equitable estoppel is to prevent fraud or acts equivalent thereof. 49 Am. Jur. Statute of Frauds, §§ 580, 581, pp. 887-889; 37 C. J.S. Statute of Frauds § 246, pp. 751, 752. Now we have already seen that the mere fact that Strahan broke his promise does not constitute fraud, and it would seem to be elementary that no man can be said to be defrauded by the fact that he is merely induced to reveal the truth concerning a transaction, as Crosby was expected to do. We say the truth, for if it was not the truth then the contract would have been against public policy and void. Moreover, it is difficult to see how the situation is changed by the mere fact that a man is induced to take a short trip in order to reveal that truth. Hence, the basis for the claim of the existence of equitable estoppel herein necessarily fails. But let us proceed. To cause an estoppel there must be unusual circumstances which give the injury inflicted unjust and unconscionable character. Goldstein v. McNeil, supra. There are no unusual circumstances in this case. Aside from the trip of a few miles to Powell for a day, the value of which might have been recovered in an action at law, Crosby did not lose anything and sustained no detriment or injury in an economic or financial sense. He lost no legal advantage. He sustained no legal disadvantage by telling the truth as to the transaction in question. The short trip of a few miles to Powell could not possibly be said to have caused a substantial "change for the worse" pecuniarily for Crosby. How could it do so when Crosby was simply to tell the truth about a transaction? Everyone ought to be willing to tell the truth. The trip could not have brought on Crosby an "unjust and un-

conscionable loss". In all probability, Crosby rode to Powell in Strahan's automobile, and the trip cost Crosby nothing. Strahan was not unjustly enriched. He may have been enriched but not unjustly so. It would be a contradiction in terms to say that one can be unjustly enriched by the revelation of truth—an element through which only society can live and prosper and abide in peace. The value of the trip to Powell is too small to form a basis for an estoppel. The trip caused no change in Crosby's position that was substantial, and we venture to say that no case can be found in which an estoppel has been held to have been created under facts such as before us. How the fact that Strahan had been Crosby's attorney can change the situation is beyond understanding. As a matter of fact if, as the evidence indicates, Strahan and Crosby were bosom friends, one would have expected that Crosby would have freely and voluntarily offered his services and told the truth about the transaction in question without compensation. If Strahan had brought an action in equity to reform his deed, if it needed reformation, he could have had Crosby subpoenaed and then Crosby would have been entitled to nothing except the fee of a witness. That, in fact, was about all that he was in connection with this trip to Powell if he revealed the truth. If the offer of Strahan could be regarded as a gift, it could not have been enforced for want of delivery. The most that can be said in favor of Crosby is that he lost a good bargain, but that is not sufficient to create an estoppel. It was said in Bennett v. Harrison, 115 Minn. 342, 132 N.W. 309, 311, 37 L.R.A.N.S. 521:

"* * * The courts have not attempted to define what extent or character of change in the situation induced by the oral agreement will be sufficient to estop the party inducing such change from questioning the validity of the oral promise. It must be a change of such

character and to such an extent that the interposing of the defense of the statute would be a fraud. The mere denial of the right promised by the oral agreement, the loss of that which existed only by virtue of the oral promise, being deprived of the bargain, does not create an exceptional situation as to the statute, but the very situation the statute covers. To take a case out of the statute because of such resulting loss or injury annuls the statute. The injury or loss which would result from the enforcement of the statute must arise from the acts done in performance or in pursuance of the oral agreement, and such acts must so far alter the situation of the parties seeking to avoid the statute that it would be unjust and against conscience to allow the other party, who has permitted such change to take place in pursuance of his oral agreement, to thereafter refuse to perform on his part. Brown v. Hoag, supra [35 Minn. 373, 29 N.W. 135]; Slingerland v. Slingerland, 39 Minn. 197, 39 N.W. 146; Thomas v. Rogers, 108 Minn. 132, 121 N.W. 630, 133 Am. St. Rep. 421.

\* \* \* \* \*

"\* \* \* There must be a definite and substantial change in situation, in performance, or in furtherance of the oral agreement before it can be said that it would be a fraud to invoke the statute against such agreement. \* \* \*"

It follows from what we have said that the contention that defendant was estopped to set up the statute of frauds is not well taken and must be overruled.

Counsel for plaintiff do not mention or rely on the doctrine of the so-called partial performance which is akin to the doctrine of estoppel and is based thereon. 49 Am.Jur. Statute of Frauds § 582, p. 889; 37 C.J.S. Statute of Frauds § 249, p. 757. But we shall examine it. It is held in Bennett v. Harrison, supra, that a part performance to take an oral agreement to convey real estate out of the statute of frauds must be sub-

stantial and of such a nature that the refusal to enforce the agreement would result not merely in the denial of the right which the agreement was intended to confer but an unjust and unconscionable injury. To the same effect is Wolfe v. Wallingford Bank & Trust Co., 124 Conn. 507, 1 A.2d 146, 117 A.L.R. 932. Moreover, the rule is well settled that services alone do not constitute part performance to take a case out of the statute of frauds except in exceptional cases where the services cannot be measured in money. 49 Am.Jur. Statute of Frauds § 467, pp. 773-775. It is said as to the exceptions in Andrews v. Aikens, 44 Idaho 797, 260 P. 423, 425, 69 A.L.R. 8:

"In practically all the cases where specific performance was decreed, the contracts called for the performance of duties of a filial and intimate personal nature, the value of which could not be estimated. * * *"

A number of these cases are mentioned in Annotation, 101 A.L.R. 923, 1097-1101 under (b). There is no reason why the services of Crosby in this case could not have been estimated in money. In Bahnsen v. Walker, 89 Okl. 143, 214 P. 732, the syllabus by the court stated:

"An oral contract made between B. and W., by which the latter agreed to use his influence to induce a third person to convey a tract of land to B., in consideration of which B. agreed to reconvey 20 acres of said tract to W., is not specifically enforceable in a suit in equity by W., upon the theory that the transaction was a joint adventure and the contract created a trust relation between B. and W."

In Whelan v. New Mexico Western Oil and Gas Co., 10 Cir., 226 F.2d 156, 161, the plaintiff sought specific performance of the conveyance of an interest in real property. The court, denying the relief sought, stated as follows:

"* * * But where performance consists of services rendered, the services must be of such exceptional or extraordinary nature that they are incapable of compensation according to any definite pecuniary standard. Paulos v. Janetakos, 41 N.M. 534, 72 P.2d 1; In re McGee's Estate, 46 N.M. 256, 127 P.2d 239. The letter contract between Hudson and the defendant disclosed on its face that it was to be performed on the part of the defendant by furnishing information and rendering services intended to aid in effectuating a sale or the development of the leasehold estate. And in his deposition, the defendant testified in substance that he furnished such information and rendered such services pursuant to the contract. But services of that kind are not of such exceptional or extraordinary nature that they are incapable of compensation according to a reasonably definite monetary measure, and therefore the defendant did not perform the contract in a manner and to an extent which removed it from the statute. Webster v. Gray, 37 Mich. 37; Appeal of Moyer, 105 Pa. 432; Russell v. Briggs, 165 N.Y. 500, 59 N.E. 303, 53 L.R.A. 556; Farrin v. Matthews, 62 Or. 517, 124 P. 675, 41 L.R.A.,N.S., 184; Bahnsen v. Walker, 89 Okl. 143, 214 P. 732; Andrews v. Aikens, 44 Idaho 797, 260 P. 423, 69 A.L.R. 8; Hall v. Haer, 160 Okl. 118, 16 P.2d 83."

The case at bar is a much stronger case. The services which were rendered consisted merely of a short trip to Powell and the revelation of some information possessed by Crosby, this information consisting merely of the revelation of the truth concerning a transaction.

In Mecum v. Metz, 30 Wyo. 495, 222 P. 574, (rehearing denied 32 Wyo. 79, 229 P. 1105), an attorney, under an oral contract, claimed a one-third interest in some mining claims in return for services performed by him. The contract was held to be within the statute of frauds and not enforceable. We see no sound reason why a different result should be reached in the case at bar.

It follows from what we have said that the action herein is barred by and cannot be enforced because of the statute of frauds. It is, accordingly, not necessary to consider any other assignments of error herein, and the judgment of the trial court is reversed and the cause remanded to that court with direction to enter judgment for the defendant and appellant herein.

Reversed with Direction.