**INTER–MOUNTAIN THREADING, INC.,
a Wyoming Corporation,
Appellant (Plaintiff),**

v.

**BAKER HUGHES TUBULAR SERVICES, INC., a Delaware Corporation,
Appellee (Defendant).**

**No. 90–139.**

Supreme Court of Wyoming.

June 10, 1991.

Jeffrey C. Gosman, Casper, for appellant.

W.W. Reeves of Reeves & Murdock, Casper, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

In this appeal we consider the doctrine of promissory estoppel in the context of preliminary negotiations in a commercial transaction. We also take the opportunity to caution members of the practicing bar who appear in this court that we expect compliance with our rules of appellate procedure. Our warning in this regard appears in the latter part of this opinion.

A jury returned a verdict finding that Baker Hughes Tubular Services, Inc. (Baker Hughes), on December 30, 1987, made a promise to Inter–Mountain Threading, Inc. (IMT) that if it would set up a facility for the manufacture of premium thread flush connections on pipe used in the oil and gas industry, then Baker Hughes would conduct an exclusive business relationship with IMT in the form of either a manufac-

turing agreement or a licensing agreement; that Baker Hughes should reasonably have expected its promise to induce action on the part of IMT; that Baker Hughes' promise did induce IMT to change its position in reliance on the promise; that Baker Hughes did not keep its promise; and that IMT suffered $100,000 damages because Baker Hughes did not keep its promise.

The trial judge granted Baker Hughes' motion for a judgment notwithstanding the verdict (JNOV). W.R.C.P. 50(b). On appeal from that judgment, IMT raises this issue:

> Whether the evidence in this case is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached in setting aside the jury verdict and granting judgment notwithstanding the verdict.

Baker Hughes identifies these issues:

1. Whether the Court correctly determined that enforcement of the promise was not required to avoid injustice.

2. Whether the promise allegedly made by Appellee was sufficiently clear and unambiguous to support a verdict based on promissory estoppel.

3. Whether Appellant took some action or forbearance of a definite and substantial character in reasonable reliance upon a promise made by Appellee.

4. Whether any significant change in position by Appellant was reasonably foreseeable by Appellee.

5. Whether Appellant sustained any compensable damage as a result of reliance upon any promise made by Appellee.

6. Whether the action was brought in the name of the real party in interest.[1]

We affirm.

## FACTS

Baker Hughes, a Delaware corporation, with offices in Houston, Texas, possesses technical information necessary to cut threads on oil field pipe which results in a flush connection. The product is referred to as "premium threads." The technical information relating to these threads includes plans, specifications, and computer programs used in computer operated lathes which cut the threads into the ends of the pipe.

Baker Hughes historically granted rather limited authority to anyone in the United States to cut its premium threads. At one time it had, under the provisions of a manufacturing agreement, conducted business with Grey–Mak, Inc., which operated a threading facility in Casper, Wyoming.

Richard A. Bonander was president of his own company called Inter–Mountain Pipe, which sold pipe. This company acquired pipe with unthreaded ends and paid others to cut threads on it before resale. In 1987, Bonander began planning the formation of a company to cut threads. This company would thread the pipe that Inter–Mountain Pipe acquired.

Greg Breed, a friend of Bonander's and a skilled machinist with special training in the operation of computerized lathes, was quality assurance manager at Grey–Mak where Inter–Mountain Pipe had most of its threads cut. He had the training and experience necessary to set up a thread-cutting facility.

In the fall of 1987, Bonander and Breed discussed the formation of a thread cutting facility. Bonander was looking around for financing. In November, he applied to the Casper Area Economic Development Alliance for a loan to purchase a state of the art computerized lathe costing $100,000. Breed was looking around for equipment.

On December 15, 1987, Breed quit his job at Grey–Mak and, within a day or two,

---

1. Baker Hughes claims that since IMT was not in existence until January 22, 1988, after Baker Hughes' alleged promise was made to Breed, an employee of Inter–Mountain Pipe, a separate entity, IMT was not the real party in interest to whom the alleged promise was made upon which to base a claim of promissory estoppel. Since the parties' pretrial memoranda and presentation of the case at trial did not effectively raise this issue and in view of our disposition of this appeal in favor of Baker Hughes, we need not address this interesting issue.

went to work for Inter–Mountain Pipe. Bonander told him he wanted to put together the threading facility they had been discussing. Breed began investigating locations and continued looking for equipment. On December 16 or 17, Breed called Jerry Haygood, Baker Hughes' manager of manufacturing and engineering, to inform him he had left Grey–Mak, was working for a fellow interested in starting up a threading facility in Casper, and was interested in talking to Baker Hughes about cutting premium threads. When Breed worked for Grey–Mak, he had become acquainted with Haygood. Haygood told Breed that the person in Baker Hughes he should talk to was David Douglas, manager of the premium thread product line.

In their search for equipment, Bonander and Breed located several lathes. To hold one in Denver until he could travel there to inspect it, Bonander sent in a deposit. He also located a Mori-seikis computerized lathe in Houston, being brokered by a fellow named Starling. Bonander told Starling he was looking for a particular brand, either a Mazak or a Mori-seikis. Breed located a Mazak in Louisiana. Bonander and Breed traveled to Louisiana to inspect the Mazak; they did not like it as it was in poor condition. They went to Houston and inspected Starling's Mori-seikis which they found to be in good condition. They did not make a commitment to buy that lathe at that time; they returned to Casper.

Breed received a call from Haygood, telling Breed that he had spoken favorably of Breed to Baker Hughes' Douglas. He gave Breed Douglas' telephone number. Breed called Douglas who said he would like to meet with him. Breed checked on travel arrangements and called Douglas to arrange a meeting on December 30. Breed told Bonander about his contact with Douglas, and they agreed they should make a deposit on Starling's lathe. On December 21, Bonander sent Starling a $10,000 deposit on the lathe.

On December 30, at a breakfast meeting in Houston attended by Breed, Haygood, and Douglas, a conversation occurred on which IMT's promissory estoppel claim

hinges. Initially, they engaged in small talk. They talked about the threading market and Breed's experience. The conversation turned to the types of agreement under which Baker Hughes did business with a thread cutting facility. From employment with Grey–Mak, Breed was familiar with the toll manufacturing type of agreement; he was unfamiliar with the licensing type of agreement. They did not agree on the terms of either a licensing agreement or a manufacturing agreement. Douglas offered to send Breed sample copies of each for him to consider. Breed told Douglas and Haygood that he was looking at a computerized lathe in Houston, but was unsure if it would cut premium threads. Although they discussed percentages of prices or money that IMT would pay to Baker Hughes under either type of agreement, there was no agreement on these matters. They did not discuss the duration of any agreement. Although they discussed products, they did not agree on which products an agreement in either form would cover. Although they discussed the subject of liability, they did not agree as to which party would assume liability for product defects under either form of agreement. They did not agree on the price IMT would have to pay for the transfer of technology; in fact, the subject of transfer fees was never mentioned. There was no agreement on what percentage of the sales price of pipe sold IMT would pay to Baker Hughes. Breed did not discuss IMT's marketing plan with Douglas. They did not discuss when IMT expected to have its threading facility operational. There was no discussion about whether Baker Hughes would wait indefinitely for IMT to establish its facility. Breed assumed that any deal with Baker Hughes would be in writing.

According to Breed, at the conclusion of the meeting, "Mr. Douglas told me that if I could go back to Casper and put a facility together that met Baker Hughes' requirements, that we would do a deal, the deal meaning either a licensing agreement or toll manufacturing agreement." During cross-examination, Breed testified that Douglas had told him "if we could get a

plant put together that would meet Baker Hughes specifications, and after they inspected it, we would have a deal." Then, Breed reiterated that Douglas' words were "we can do a deal." Breed characterized Douglas' words as a "leaving remark."

After the meeting Breed and Haygood toured Baker Hughes' operation, had lunch, and then went to Starling's to look at the lathe that Breed and Bonander wanted. After they checked out the lathe, the only discussion Breed and Haygood had was that Haygood said it was a good machine and the tolerances on it were very tight.

After Breed and Haygood parted company, Breed called Bonander in Casper and reported on the day's events. Breed returned to Casper. Bonander called Starling to inform him he wanted to buy the lathe. By January 4 or 5, 1988, Bonander had arranged a lease agreement to finance the purchase of the lathe and other equipment. On January 22, 1988, IMT's articles of incorporation were filed with the secretary of state's office.

By letter dated January 27, 1988, Douglas sent Breed, as he said he would, two types of agreement. In the letter, Douglas stated, in pertinent part, "Review these so that we may determine the most beneficial arrangement for both our companies. Neither document is submitted as a proposal to your company. The terms and conditions of any agreement between us must be negotiated separately."

By March, IMT's threading facility was nearing completion. The parties arranged for Douglas to visit the facility on April 20, 1988. During that visit, the parties discussed establishing a business relationship under one or the other of the two sample agreement forms Douglas had sent Breed in January. The negotiations went back and forth, ultimately resulting in the understanding that Douglas would have Baker Hughes' lawyers in Houston prepare a licensing agreement and send that to IMT.

As Douglas was returning to Houston from the April 20 meeting, Bonander received word from a company that it wanted to place an order for premium thread. For this specific order, IMT and Baker Hughes entered into a one-time agreement. However, Baker Hughes never sent to IMT the licensing agreement instrument discussed at the April 20 meeting in order to facilitate establishment of an ongoing contractual relationship beyond the one-time agreement. According to Bonander, Douglas gave him the run-around for an extended period of time. Finally, in August, Baker Hughes informed IMT there would be no agreement.

IMT filed suit alleging various theories of recovery including breach of contract, fraudulent misrepresentation, bad faith tort, negligence, prima facie tort, and promissory estoppel. By the time the case was submitted to the jury for deliberation, all counts, except promissory estoppel, had been dropped.

When IMT rested its case-in-chief, Baker Hughes moved for a directed verdict. The trial court took the motion under advisement, deciding to let the case go to the jury. After Baker Hughes rested, closing arguments were made and the case submitted to the jury. The jury returned a verdict in favor of IMT. Several days later, Baker Hughes moved for JNOV. After due consideration, the trial court granted the motion. This appeal followed.

## STANDARD OF REVIEW

When this appellate court is faced with a JNOV question, we undertake a full review of the record without deference to the views of the trial court. *Cody v. Atkins*, 658 P.2d 59, 61–62 (Wyo.1983). In determining whether a JNOV motion should be granted, we consider "whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached * * *." *Erickson v. Magill*, 713 P.2d 1182, 1186 (Wyo. 1986). In our review we consider the evidence favorable to the nonmoving party, giving it all reasonable inferences. *Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979).

A court should cautiously and sparingly grant JNOV motions. *Erickson*, 713 P.2d at 1186.

## DISCUSSION

Applying our standard of review, we reach the same conclusion as the trial judge. The evidence as revealed in the trial transcript and other record is wholly insufficient to support a verdict based on the doctrine of promissory estoppel.

We have recognized and applied the closely related doctrines of equitable estoppel and promissory estoppel on other occasions. *Provence v. Hilltop National Bank*, 780 P.2d 990 (Wyo.1989) (promissory estoppel and equitable estoppel); *Roth v. First Security Bank of Rock Springs*, 684 P.2d 93 (Wyo.1984); *Cheyenne Dodge, Inc. v. Reynolds & Reynolds Co.*, 613 P.2d 1234 (Wyo.1980) (equitable estoppel); *Remilong v. Crolla*, 576 P.2d 461 (Wyo.1978) (promissory estoppel); *Wood v. Trenchard*, 550 P.2d 490 (Wyo.1976) (equitable estoppel); *Crosby v. Estate of Strahan*, 78 Wyo. 302, 324 P.2d 492 (1958) (equitable estoppel); *Vogel v. Shaw*, 42 Wyo. 333, 294 P. 687, 75 A.L.R. 639 (1930).

In *Provence* the court identified the well-established elements of promissory estoppel:

> (1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support the enforcement of the agreement.

*Provence*, 780 P.2d at 993. There, we looked to *National Bank of Waterloo v. Moeller*, 434 N.W.2d 887 (Iowa 1989). *Moeller* correctly informs us that, with respect to the first element, a clear and definite agreement, the "dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action * * * on the part of the promisee.' *Restatement (Second) of Contracts* § 90 (1981)." *Id.*, 434 N.W.2d at 889.

■ Focusing on the first element, we cannot conclude that Douglas' oral statements at the December 30 breakfast meeting are promises clear and unambiguous in their terms. His conversational remarks are, at best, mere expressions of hope and opinion in an obviously preliminary negotiation context. In somewhat analogous preliminary negotiation contexts, we have viewed similar remarks as mere expressions of opinion and agreements to agree. *See Czapla v. Grieves*, 549 P.2d 650, 653 (Wyo.1976) (owner's agent made such remarks as "This was as good as sold, that the deal would be final"); *Roth*, 684 P.2d at 95 (bank director made such remarks as "Things look very good at this time" and "You don't have any * * * problems as long as I own the bank"); and *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 928 (Wyo.1989) (bank president told loan applicant that proposed line of credit was "not any problem"). *See also Rialto Theatre v. Commonwealth Theatres, Inc.*, 714 P.2d 328, 334 (Wyo.1986) (portion of lease agreement "is merely an agreement to agree in the future"). In similar cases other courts have likewise found such expressions made in the course of preliminary negotiations not to be promises. *See e.g., Jungmann v. St. Regis Paper Company*, 682 F.2d 195 (8th Cir.1982); *Blanton Enterprises, Inc. v. Burger King Corp.*, 680 F.Supp. 753 (D.S.C.1988); *Tull v. Mr. Donut Development Corp.*, 7 Mass.App. 626, 389 N.E.2d 447 (1979); *Pacific Cascade Corp. v. Nimmer*, 25 Wash.App. 552, 608 P.2d 266 (1980).

Turning to the other elements of promissory estoppel, IMT could not have reasonably relied on Douglas' remarks as a promise that Baker Hughes had awarded IMT a thread cutting agreement at the December 30 meeting. IMT was not in existence at that meeting and would not be until late the next month. The evidence unequivocally demonstrated that the parties contemplated further discussions and negotiations leading to a signed document in the form of either a toll manufacturing agreement or a licensing agreement. Although Breed was familiar with the nature of a manufacturing agreement before the December 30

meeting, he was not familiar with a licensing agreement. Douglas explained to him some of the features of both and drew for him their significant differences. Although they discussed in a general way price percentages under the differing forms of agreement, they reached no agreement of any kind. Specific prices were not discussed. Money was not discussed. The duration of an agreement was not discussed. They had no agreement on what products an agreement would cover. There was no agreement on the price to be paid for a transfer of technology.

It is clear from the evidence that Baker Hughes' business relationships under either form of agreement would not have been simple arrangements free of details. Either contemplated relationship would have bound the parties for a substantial period of time and would have involved substantial sums of money. Considering what is at stake in terms of product, technology, trade secrets, money, and reputation, it is important that the relationship and commitment of the parties, each to the other, be carefully expressed in a formally executed written document. For the above and foregoing reasons, we also conclude that Baker Hughes could not have expected or foreseen IMT's alleged reliance on Douglas' remarks at the breakfast meeting.

■ With respect to the element of whether the equities support enforcement of the promise, the trial court correctly treated that matter as a question of law for it, not the jury, to decide. *U.S. Oil Company v. Midwest Auto Care Services Inc.,* 150 Wis.2d 80, 440 N.W.2d 825, 828 (1989). "[T]he third requirement, that the remedy can only be invoked where necessary to avoid injustice, is one that involves a policy decision by the court. Such a policy decision necessarily embraces an element of discretion." *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965). We agree with the trial court's decision on this question in light of all the evidence. As explained in its decision letter,

[t]here was no showing that [IMT] will not be able to utilize its equipment, and none that it will not be able to obtain future contracts. In fact, the evidence discloses that plaintiff has a threading business established, and that said business has been moderately successful. The present business conforms to the prospectus furnished to financial institutions prior to contacts with [Baker Hughes].

■ Before closing this opinion, we find it necessary to comment on certain deficiencies revealed in the briefing presented to this court by IMT's counsel. First, counsel's statement of the facts contains numerous inappropriate page references to the record. *See* W.R.A.P. 5.01. In many instances, counsel's recitations of purported facts are either inaccurate, misleading, or not supported in the record. In addition, counsel's practice of showing only beginning page references to the trial transcripts falls short of what this court requires under our rule. We strongly advise counsel hereafter to be precise, specific and complete when making page references to the record in connection with all statements of fact relevant to the issues presented on appeal.

Second, IMT's counsel asserts that the trial court's promissory estoppel instruction to the jury was one offered by Baker Hughes' counsel and contained, among other elements, the element that the promise is binding if injustice can be avoided only by enforcing the promise. Counsel then claims that, since Baker Hughes' counsel obviously did not object to the court's giving that instruction, Baker Hughes cannot on appeal be heard to say that the "injustice" question was really one for the trial court and to complain that the jury should not have been allowed to answer the question. We have carefully examined the record. The trial court gave Instruction No. 5, covering the elements of promissory estoppel, to the jury. Contrary to the inaccurate assertion and misleading argument of IMT's counsel, that instruction does not contain the "injustice" element. IMT's appellate counsel tried the case below. We

are at a loss to understand how that counsel could be so mistaken about this instruction.

IMT counsel's inappropriate page references to the record and inaccurate and misleading argument based on a nonexistent jury instruction have wasted this court's time most unnecessarily. We do not expect these practices to be repeated. Should they be, extreme summary measures shall be taken.

Affirmed.