2004 WY 90

**Nina H. PARKHURST, Appellant (Plaintiff),**

v.

**Carl D. BOYKIN and Debbie Boykin, Appellees (Defendants).**

**Carl D. Boykin and Debbie Boykin, Appellants (Defendants),**

v.

**Nina H. Parkhurst, Appellee (Plaintiff).**

Nos. 03–193, 03–194.

Supreme Court of Wyoming.

July 23, 2004.

Representing Appellant Nina Parkhurst: William L. Hiser of Brown & Hiser, LLC, Laramie, WY.

Representing Appellees Carl D. and Debbie Boykin: Stephen H. Kline of Kline Law Office, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ, and JAMES, D.J.

HILL, Chief Justice.

[¶ 1] Nina H. Parkhurst (Parkhurst) seeks review of an order of the district court that found that her son and daughter-in-law, Carl D. "Doug" Boykin and Debbie Boykin (the Boykins), were entitled to retain 100 bales of hay from Parkhurst's ranch. Parkhurst also challenges the district court's determination that the Boykins, as joint owners

of a bank account with Parkhurst (who was the primary source of the deposits in the account), could withdraw all of the funds from that account without accounting to her or without a requirement that she be reimbursed for at least half of the monies withdrawn. This portion of the appeal is identified as Case No. 03–193.

[¶ 2] In their cross appeal, the Boykins seek review of an order of the district court that granted summary judgment in favor of Parkhurst on their claim that they were entitled to a 49% interest in a ranch owned by Parkhurst (the Huston Ranch), as well as some personal property associated with the ranch. The Boykins' claims were premised on theories of an oral contract, promissory estoppel, and equitable estoppel. This portion of the appeal is identified as Case No. 03–194.

## ISSUES

[¶ 3] In Case No. 03–193, Parkhurst raises these issues:

A. Does the evidence support the District Court's ruling that Defendants, Carl D. Boykin and Debbie Boykin, may retain 700[sic] bales [1] of hay taken from the Huston Ranch?

B. May one joint owner of a joint bank account withdraw all of the funds from that account without accounting to, or being required to reimburse the monies withdrawn to, the other joint [owner] who was the primary source of the deposits to the account?

The Boykins restate the issues thus:

A. Did Parkhurst prove by a preponderance of the evidence that she is entitled to damages for conversion of 100 bales of hay taken by the Boykins from the Huston Ranch?

B. Did Parkhurst prove by a preponderance of the evidence that she has a right to make a claim against [the Boykins] for any portion of funds taken by him from an account jointly owned by them?

[¶ 4] In Case No. 03–194, the Boykins raise these issues:

1. Did the District Court commit error in granting [Parkhurst's] motion for summary judgment on [the Boykins'] claim that they are entitled to 49% of the Huston Ranch and other personal property pursuant to an oral contract between the parties?

2. Did the District Court commit error in granting [Parkhurst's] motion for summary judgment on [the Boykins'] claim that they are entitled to 49% of the Huston Ranch and other personal property under the theories of promissory estoppel and/or equitable estoppel?

Parkhurst's response to those claims is:

A. Is the Statute of Frauds applicable to this case?

B. Is there sufficient evidence to allow this matter to proceed to trial under the "substantial part performance" exception to the Statute of Frauds?

C. Is there sufficient evidence to allow this matter to proceed to trial under the "promissory and/or equitable estoppel" exception to the Statute of Frauds?

## FACTS AND PROCEEDINGS

[¶ 5] Parkhurst initiated this litigation by complaint filed on August 13, 2001. In her first amended complaint, she averred that she was the owner in fee simple absolute and was entitled to a property known as the Huston Ranch, as well as livestock, machinery, vehicles, and other personal property used in the ranch operation. She stated that the Boykins came into possession of a portion of the ranch property and personal property pursuant to a license granted by her. Parkhurst professed that she had terminated that license and demanded that possession of the real and personal property be restored to her, and that the Boykins refused to relinquish the property. Her claims included one to quiet title to the property in her, and to establish that the Boykins had no estate,

---

1. The record establishes that it was 100 bales of hay, with a value of between $250.00 and $700.00 (depending upon whether it was valued at the time the Boykins took possession of the hay, or at the time of trial).

right, title or interest whatsoever in it.[2] In addition, she sought to eject the Boykins from the ranch. She maintained that the Boykins had trespassed on her property and had converted crops and personal property to their own use, for which she sought damages. She claimed she had loaned the Boykins $39,589.00 and they had repaid only $7,500.00, leaving a balance due her of $32,089.00. She demanded repayment of that amount. She also asserted that she had maintained a joint checking account with the Boykins, and that the Boykins had withdrawn $7,400.00 from that account and converted it to their own use. She sought to be paid all sums from that account found to be owned by her or attributable to her.

[¶ 6] In answer to Parkhurst's complaint, the Boykins claimed that they were entitled to be on the ranch under the terms of an oral contract with Parkhurst, and that the oral contract also entitled them to a 49% interest in the Huston Ranch and associated personal property. With respect to personal property issues, the Boykins claimed that some of the personal property on the ranch belonged to them or was jointly owned by them with Parkhurst. The Boykins also claimed they were justified in withdrawing money from the parties' joint checking account. The Boykins filed counterclaims which included: A claim for specific performance of their alleged oral contract with Parkhurst; breach of that contract by Parkhurst; promissory estoppel; equitable estoppel; unjust enrichment; quantum meruit; and declaratory and injunctive relief.

[¶ 7] In answer to interrogatories propounded by Parkhurst, the Boykins related the following sequence of events:

In November of 1997, Nina Parkhurst came to our house in Encampment, Wyoming and told us that she and her sister were splitting the ranch. She told us that she needed someone to manage her half of the ranch and that if we would come out to live on the ranch and manage it for a year, she would then deed 49% of the ranch to us at the end of that year. She told us that she would also transfer the "NX" brand to us. Nina also promised us if we

would come manage the ranch that she would give us all the off-colored heifer calves produced by her herds.

Part of the agreement was that we were to be able to continue to run our outfitting business from the ranch. We discussed the fact that sometimes the outfitting business did well financially and when it did well, we wouldn't need to take a monthly draw or money from the ranch. It was agreed that we could take a draw whenever we needed one and when we did, Nina would write a check.

Based on the agreement we had with Nina, we agreed to move out to the ranch and manage it. [Parkhurst] also promised us at that time that as time went on, she would gradually deed to us the rest of the ranch as she had previously done with Doug's brother Randy and the Z< [Z Lazy V] Ranch. Nina indicated that she would investigate the best manner in which to transfer the rest of the ranch in order to limit inheritance tax. Nina indicated that she had several meetings with Bill Hiser concerning ways for us to avoid paying inheritance tax on the ranch.

We started moving to the ranch in late December of 1997. Nina needed our flatbed and our horses to operate the ranch, and we brought those to the ranch. We also bought a small plow, a sweep and a small square baler for use on the ranch. Additionally, we bought a couple of bulls to use on the cowherd. We used our own vehicles for ranch purposes year round. We supplied the wood-burning stove for the shop. We bought veterinary supplies, salt and tubs and little things along the way. We bought ear tags for the whole herd ($1.50–2.00 per tag for 200+ cows and calves).

After we had been on the ranch for a year, we asked Nina about transferring title to the 49%. Nina told us that she didn't have money for attorney fees at that time to accomplish the transfer of the 49% but that she would get it transferred when she did have the money for a lawyer. In the summer of 1999, Nina told us that she

2. *See* Wyo. Stat. Ann §§ 1–32–201 through 216 (LexisNexis 2003).

was forming a corporation for the joint ownership of the ranch and gave us the unsigned paperwork reflecting that she was going to form the corporation. Later that summer she indicated to us she had been·to an estate-planning seminar, and she gave us some of the paperwork from that seminar. She indicated that she was concerned about the tax consequences of a transfer. At some point she gave us Nina Huston's estate tax return to show us the manner in which the land was transferred to Nina Parkhurst and the consequences of the transfer.

During much of this time, Nina's husband was ill, and Nina stayed with her husband and seldom came to the ranch during that year. We did not press the issue of the transfer of the 49% of the ranch that year. However, in 2000 we had many more discussions with Nina about the transfer of 49% of the property. At some point she told [us] that she was considering using a limited liability company or an insurance trust to transfer the property instead of a corporation. She typed her thoughts out for us in this regard. She also brought an accountant named Dennis Tschacher to the ranch who discussed the consequences of the transfer of half of the ranch to us and the sale of the gift and/or sale of the remainder (with the purchase price to be forgiven at death) over time. Nina never denied that she had promised us that she would transfer the interest in the ranch, but rather she kept indicating to us that she had to consult with her accountant and her lawyer about how best to accomplish the transfer.

. . . .

When [Parkhurst] proposed her arrangement to us, we owned a tree trimming service that had existing debt. We told [Parkhurst] that we could not pay the debt if we returned to the ranch. [Parkhurst] then agreed to give us $39,000 to pay off the debt. That payment was made in March of 1998. At about the same time that [Parkhurst] gave us the money, she bought Randy Boykin a scraper for about $30,000. [Parkhurst] told us that she had the $39,000 in the bank and wasn't making much interest on it and that she would give

Doug the money to be fair to both brothers. Doug told [Parkhurst] that he wanted to pay her back but [Parkhurst] indicated she didn't care if he did or not.

[¶ 8] In contrast to the Boykins' assertions, Parkhurst gave this description of their working relationship in her answers to interrogatories propounded by the Boykins:

I knew I was going to need some help to work the ranch when the Huston Family Partnership was dissolved and division of the ranch acreage between my sister and myself was completed. I was aware that Doug was out of work, his tree business wasn't doing very well and with winter coming on I thought that he might be interested in working on the ranch. Around Thanksgiving, 1997, I suggested that Doug move to the ranch and help me operate it. We did not have any real definite terms, he was to live on [the] property and help with the ranch responsibilities. Later, after my husband became ill and I needed to spend full time with him making me unavailable at the ranch, I spoke with Doug about taking over all of the work and asked him what he would need in order to make ends meet with Debbie and his two sons. Doug requested $2,500 per month. I spoke with my accountant about how to handle the payment and agreed to pay Doug $2,500 per month for each month he worked there full time, noting that he would not be paid for the months he took off for guiding or was otherwise unavailable to work. Doug was to take care of all ranching work subject to my direction concerning what work should be done and what work was a priority.

. . . .

I did not have any arrangements with Debbie in regard to the work that she performed on the Huston Ranch.... I never asked or directed Debbie to do any of the things that she did and I left those issues between Doug and Debbie.

. . . .

... Our [Doug's and Parkhurst's] biggest issues came from his [Doug] pressuring me to set up a partnership arrangement with

him similar to what I had done with my other son.[3]

. . . .

My intent was to have someone on the ranch to help me, to keeping it productive and intact. Also, it was good to have someone in the house as I had a home in Encampment with my husband Jack, where I had lived since our marriage in 1985. I did have hopes that matters might work out where Carl D. Boykin might some day own and operate the ranch but I had no intentions of transferring the property to him at any specific point or time. My intent was for Carl D. Boykin to help me for the time being and we would see how things developed in the future.

. . . .

No. I had hopes that things might work out that way and Carl D. Boykin and I had conversations about our mutual hopes of keeping the ranch in the family in hopes my grandchildren might some day share the vision of keeping the "family farm." Carl D. Boykin and I discussed the possibility of doing a "partnership" similar to what I had done with my other son, Randy Boykin, but no agreements were reached and no intentions on my part were established.

[¶ 9] Parkhurst filed a motion for summary judgment as to all issues before the trial court. The Boykins contended that none of the issues could appropriately be resolved by motion for summary judgment because there were genuine issues of material fact that had to be resolved by the fact finder. Ultimately, the district court did grant summary judgment in favor of Parkhurst with respect to her quiet title action.[4] In so doing, the district court applied the statute of frauds, Wyo. Stat. Ann. § 1–23–105 (LexisNexis 2003), which provides:

---

3. In her deposition, Parkhurst explained why she was reluctant in this regard:
 This is very hard. Because years before Doug came to the ranch he had been doing his thing however and whenever. Lots of times I had the grandsons. Lots of times I was asked to come and help him get home. Just lots of little things that added up that I wasn't sure I wanted to do what we're talking about doing.

§ 1–23–105. **Agreements void unless in writing.**

(a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:

(i) **Every agreement that by its terms is not to be performed within one (1) year from the making thereof;**

(ii) Every special promise to answer for the debt, default or miscarriage of another person;

(iii) Every agreement, promise or undertaking made upon consideration of marriage, except mutual promise to marry;

(iv) Every special promise by an executor or administrator, to answer any demand out of his own estate;

(v) **Every agreement or contract for the sale of real estate, or the lease thereof, for more than one (1) year;**

(vi) To charge any person upon, or by reason of a representation or assurance concerning the character, conduct, credit, ability, trade or dealings of another, to the intent or purpose that such other may obtain thereby, credit, money or goods. [Emphasis added.]

[¶ 10] The district court's reasoning began with its recognition that it was interpreting an alleged oral contract for a conveyance of real property and that such contracts must be in writing. The district court found that the statute of frauds was applicable and then proceeded to consider the Boykins' assertions that their agreement with Parkhurst fell within an exception to its application. The district court declined to invoke the exception of substantial part performance by the Boykins because the agreement alleged was too indefinite and uncertain so as to provide a basis for determining what "per-

---

And until my mind's made up to do that—I'm a stubborn old woman.

4. The district court also granted summary judgment in favor of Parkhurst with respect to Debbie Boykin's claims of unjust enrichment and quantum meruit, but that decision is not challenged in this appeal.

formance" meant under the alleged contract. The district court also eliminated the availability of promissory estoppel as an exception to the application of the statute of frauds because there was no clear and definite agreement between the parties.

[¶ 11] Only three matters were set for trial to the court: (1) The question of whether Parkhurst's $39,859.00 check to Doug Boykin was a loan that he was required to repay; (2) whether the Boykins were required to return a backhoe to Parkhurst and to pay her for the 100 bales of hay; and (3) whether Doug Boykin was required to account for and repay to Parkhurst 50% of the money ($7,400.00) he withdrew from a joint checking account with Parkhurst. The district court issued a second decision letter after trial. In that decision he concluded that: (1) The loan was an interest free loan which Doug Boykin was required to repay upon Parkhurst's demand (less $7,500.00 attributed to a payment on that loan); (2) the Boykins were required to return the backhoe to Parkhurst;[5] (3) the Boykins did not have to pay for the hay; and (4) the Boykins had a right to withdraw the $7,400.00 and were not required to account for that money or to repay any part of it to Parkhurst.

[¶ 12] We will address the issues raised in this appeal in chronological order, addressing Case No. 03–194 first, and will include additional facts with our discussion, as necessary.

## DISCUSSION

**Case No. 03–194**

**Propriety of Summary Judgment and Application of Statute of Frauds to Oral Agreement**

[¶ 13] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Burnham v. Coffinberry*, 2003 WY 109, ¶ 9, 76 P.3d 296, ¶ 9 (Wyo.2003).

[¶ 14] Because the correct application of the statute of frauds plays such a significant role in resolving this case, we set out a summary of the central principles applicable to that venerable rule:

> Long ago, this Court held that "[w]ith some exceptions, equity as well as the law is bound by the statute of frauds." *Crosby v. Strahan's Estate*, 78 Wyo. 302, 324 P.2d 492, 496 (1958). In more recent years, we have further held that these exceptions should be restricted, rather than expanded, even when hardship may result. *Fowler v. Fowler*, 933 P.2d 502, 504 (Wyo.1997); *Empfield v. Kimbrough*, 900 P.2d 1153, 1155 (Wyo.1995); *Turner v. Floyd C. Reno & Sons, Inc.*, 696 P.2d 76, 79 (Wyo.1985). At the same time, however, we have held that promissory estoppel may avoid application of the statute of frauds. *Davis v. Davis*, 855 P.2d 342, 348 (Wyo.1993); *Ames v. Sundance State Bank*, 850 P.2d 607, 610 (Wyo.1993); *B & W Glass, Inc. v. Weather Shield Mfg., Inc.*, 829 P.2d 809, 815 (Wyo.1992).

*Birt v. Wells Fargo Home Mortgage, Inc.*, 2003 WY 102, ¶ 25, n. 25, 75 P.3d 640, ¶ 25, n. 25 (Wyo.2003).

[¶ 15] The determination that a given agreement is within the statute of frauds is a question of law which we review *de novo*. However, rote application of the statute of frauds is not automatic. Enforcement of the statute of frauds serves significant policy concerns:

> The statute of frauds was enacted to prevent fraud, not to aid it, and should receive a reasonable interpretation with

---

5. Items (1) and (2) are not a subject of this appeal.

that end in view. The great majority of courts have always endeavored to keep that principle uppermost in rendering their decisions.

*Mead v. Leo Sheep Co.*, 32 Wyo. 313, 327, 232 P. 511, 515 (1925).

*In re Estate of Maycock*, 2001 WY 103, ¶¶ 12, 19, 33 P.3d 1114, ¶¶ 12, 19 (Wyo.2001).

"The contract for the sale of real estate as contemplated by the statute is one for the transfer of property or real estate, for a fixed price in money or its equivalent." *Miller v. Stovall*, 717 P.2d 798, 802 (Wyo. 1986), overruled on other grounds, 811 P.2d 287, 290 (Wyo.1991) (citing *Allen v. Allen*, 550 P.2d 1137, 1142 (Wyo.1976)). Assuming without deciding that the alleged oral agreement between Hovendicks and Ruby involved a conveyance of land for proper consideration and is subject to the statute of frauds, we note that in *Miller* we referred favorably to several authorities on the law of real property as follows:

[6 Thompson on Real Property § 3035, p. 508 (1962) ] states clearly that "oral agreements changing known boundary lines violate the statute of frauds." The rationale is that " * * * if the boundary line is not doubtful or in dispute, an oral agreement for its change is invalid, this involving an actual transfer of land, within the statute. * * * " 2 Tiffany, The Law of Real Property § 653, p. 679 (3d. ed.1939).

*Miller*, 717 P.2d at 802. Hovendicks contend that the parties' substantial part performance of the contract makes it enforceable despite the statute of frauds.

We have held that either full or part performance of a contract for the sale of land will avoid the statute of frauds defense. *Davis v. Davis*, 855 P.2d 342, 346 (Wyo.1993). The doctrine of part performance, however, will not be applied to avoid the statute of frauds unless the oral agreement sought to be enforced is just and certain and the elements of possession and part or full payment or its equivalent are proved beyond the possibility of findings to the contrary. *Davis*, 855 P.2d at 347.

*Hovendick v. Ruby*, 10 P.3d 1119, 1123–24 (Wyo.2000); and see 14 Richard R. Powell, The Law of Real Property, §§ 81A.02[1] and 81A.02[2] and [3] (*The Impact of the Statute, Criticized as Too Rigid and Leading to Unfair and Arbitrary Results, Has Been Reduced by Requirements of Reasonable Interpretation and Equitable Exceptions*) (Michael Allan Wolf ed.1999).

[¶ 16] Along this same vein, we take note of this summary of a line of cases pertinent to the matter at hand:

An oral gift of land is within the statute of frauds and is, therefore, unenforceable even as between the donor and the donee. However, equity will remove an oral gift of land from the statute of frauds when, in reliance upon the gift, the donee has done something so that a refusal of the court to enforce the gift would result in the infliction of an injustice upon the donee. It had been said that equity will remove an oral gift of land from the statute of frauds where not to do so would work a fraud upon the donee.

John S. Herbrand, Annotation, *Exceptions to Rule that Oral Gifts of Land are Unenforceable Under Statute of Frauds*, 83 A.L.R.3d 1294, § 2, at 1298 (1978 and Supp.2003).

[¶ 17] Proof of an oral gift of land must be clear and convincing, and the burden is on the donee to prove the existence of a donative intent on the part of the donor. The land in question must be identified with reasonable certainty. Herbrand, Annotation, *Exceptions to Rule that Oral Gifts of Land are Unenforceable Under Statute of Frauds*, 83 A.L.R.3d 1294, § 2, at 1298.

Many jurisdictions recognize that where a donee takes possession of land and makes substantial improvements in reliance on a gift, such conduct gives rise to an exception to the rule that oral gifts of land are unenforceable under the statute of frauds. Among these jurisdictions, there are slight variations in the phrasing of the exception and in the requirements of the exception. For instance, while some jurisdictions require that substantial improvements be made to the land, other jurisdictions require permanent and valuable improvements, or significant improvements, or lasting improvements; however, despite the differences in phrasing, the

underlying requirement is such quantum and quality of improvement to the land as would make it inequitable to refuse to enforce the gift. Furthermore, at least one jurisdiction, in addition to the requirements that possession of the land must have been taken and improvements made upon the land, requires that the donee must have changed his condition or circumstances or been induced to forgo some benefit or assume some liability on the strength of the gift.

. . . .

Since the underlying principle of exceptions to the rule that oral gifts of land are unenforceable is that the refusal of the court to enforce the oral gift would be an injustice to or a fraud upon the donee, it is not surprising that other circumstances besides the making of substantial improvements have served to support such exceptions. Thus, it has been held that where the donees had rendered, without compensation, personal services and attention to the aged donor in reliance on the oral gift of land, and where the donees had possession of the land in controversy, the services rendered were sufficient to warrant an exception to the statute of frauds and enforcement of the gift. And it has also been held that a change of residence, accompanied by the donee's possession of the land, would support an exception to the rule that oral gifts of land are unenforceable under the statute of frauds.

*Id.* at 1299–1301.

[¶ 18] The standard of review applicable to oral contracts is also of great importance here. We have heretofore set out these guidelines:

The basic elements of a contract are offer, acceptance, and consideration. *Mc-Lean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001). In order for a contract to exist, there must be mutual assent to the same terms. *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 231 (Wyo.2000). Whether a contract exists, its terms and conditions and the intent of the parties generally are questions of fact to be resolved by the fact-finder. *Ewing v. Hlad-*

*ky Const., Inc.*, 2002 WY 95, ¶ 11, 48 P.3d 1086, 1088 (Wyo.2002) (*quoting Roussalis*, 4 P.3d at 250). An express contract is one in which the terms are declared by the parties either in writing or orally at the time the contract is formed. *Boone v. Frontier Refining, Inc.*, 987 P.2d 681, 685 (Wyo.1999); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 216 (Wyo.1994). An express oral contract may be interpreted as a matter of law if the terms are shown without conflict in the evidence. *Anderson v. South Lincoln Special Cemetery Dist. ex rel. Bd. of Trustees of South Lincoln Special Cemetery Dist.*, 972 P.2d 136, 139 (Wyo.1999).

*Birt*, ¶ 10; and see *Carroll v. Bergen*, 2002 WY 166, ¶ 10, 57 P.3d 1209, ¶ 10 (Wyo.2002) ("Whether an oral contract exists is a question of fact to be determined by the trier of fact.").

[¶ 19] We have examined the applicable authorities with care, as well as the materials that were available to the district court for its evaluation of the motion for summary judgment. We conclude that the district court was correct in its application of the statute of frauds. At most, Parkhurst and Boykin entered into an "agreement to agree" that Parkhurst would consider a transfer of a 49% interest in the Huston Ranch at some future time.

We have said, in a number of different instances and contexts, that we do not endeavor to enforce "agreements to agree." *Lavoie v. Safecare Health Serv., Inc.*, 840 P.2d 239 (Wyo.1992); *Inter-Mountain Threading, Inc. v. Baker Hughes Tubular Services, Inc.*, 812 P.2d 555 (Wyo.1991); *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927 (Wyo.1989); *Rialto Theatre, Inc. v. Commonwealth Theatres, Inc.*, 714 P.2d 328 (Wyo.1986); *Roth v. First Sec. Bank of Rock Springs, Wyoming*, 684 P.2d 93 (Wyo.1984); *Czapla v. Grieves*, 549 P.2d 650 (Wyo.1976).

*Del Rossi v. Doenz*, 912 P.2d 1116, 1120 (Wyo.1996) (J. Thomas concurring specially).

[¶ 20] While we do not disagree with those authorities that counsel vigilance in cases such as this, so as to ensure that the

statute of frauds is not used to perpetrate a fraud, the Boykins have failed in their burden "to show the existence of an oral agreement that is just and certain and the elements of possession and part or full payment or its equivalent are proved beyond the possibility of findings to the contrary." *See Davis v. Davis*, 855 P.2d 342 (Wyo.1993); also *see Fowler v. Fowler*, 933 P.2d 502 (Wyo. 1997) (This later case is instructive, however, it was decided on its facts after a trial to the district court and this Court reversed, deciding it on the statute of frauds as a matter of law; son had left job in Fort Collins, Colorado, moved to father's ranch and worked there for 20 years). The instant case does not demonstrate a factual situation that would persuade us to diverge from our longstanding commitment to a fairly strict application of the statute of frauds. We hold that the district court did not err in granting partial summary judgment in favor of Parkhurst on the basis of that statute.

[¶ 21] Having concluded that no oral contract came into being, we must also address the Boykins' estoppel contentions.

"Promissory estoppel is a doctrine incorporated in the law of contracts." *B & W Glass, Inc. v. Weather Shield Mfg., Inc.*, 829 P.2d 809, 813 (Wyo.1992). Its general theory is that, " '[i]f an unambiguous promise is made in circumstances calculated to induce reliance, and it does so, the promisee if hurt as a result can recover damages.' " *Id.* (*quoting Goldstick v. ICM Realty*, 788 F.2d 456, 462 (7th Cir.1986)). Promissory estoppel applies, however, only if no contract exists. *Sowerwine v. Keith*, 997 P.2d 1018, 1021 (Wyo.2000). The elements of promissory estoppel are:

"(1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise."

*City of Powell v. Busboom*, 2002 WY 58, ¶ 8, 44 P.3d 63, 66 (Wyo.2002) (*quoting Roussalis*, 4 P.3d at 253). The party asserting promissory estoppel has the bur-

den of establishing each element under a burden of strict proof. *Busboom*, 2002 WY 58, ¶ 8, 44 P.3d at 66. The first two elements are questions of fact for the factfinder; the third element is a question of law for the court. *Id.*; *Loya v. Wyoming Partners of Jackson Hole, Inc.*, 2001 WY 124, ¶ 22, 35 P.3d 1246, 1254 (Wyo.2001).

For purposes of the doctrine of promissory estoppel, a promise is a "manifestation of intention to act or to refrain from acting in a specified way made so as to justify a promisee in understanding that a commitment has been made." *Busboom*, 2002 WY 58, ¶ 10, 44 P.3d at 66. A promise may arise through words or conduct, but conduct must be specifically demonstrative of an intention respecting future conduct before it can serve as the foundation for a clear and definite promise. *Id.*, 2002 WY 58, ¶ 10, 44 P.3d at 66–67.

In addition to establishing the existence of a clear and definite promise, a plaintiff must also show " 'action or forbearance of a definite and substantial character' " to satisfy the second element of the doctrine. *Loya*, 2001 WY 124, ¶ 22, 35 P.3d at 1254 (*quoting Worley*, 1 P.3d at 624). Further, such action or forbearance must be the result of "reasonable reliance." *Davis v. Davis*, 855 P.2d 342, 348 (Wyo.1993).

. . . .

" 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might otherwise have existed as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse.' " *Snake River Brewing Co., Inc. v. Town of Jackson*, 2002 WY 11, ¶ 28, 39 P.3d 397, 407–08 (Wyo.2002) (*quoting State Farm Mut. Auto. Ins. Co. v. Petsch*, 261 F.2d 331, 335 (10th Cir.1958)). "Equitable estoppel arises only when a party, by acts, conduct, or acquiescence causes another to change his position." *Roth v. First Sec. Bank of Rock Springs*, Wyo., 684 P.2d 93, 96 (Wyo.1984). The elements of equitable estoppel are a lack of knowledge, reliance in good faith, and action or inaction that results in an injury. *Id.* Eq-

uitable estoppel is similar to promissory estoppel, but equitable estoppel is a tort doctrine that requires proof of misrepresentation. *B & W Glass, Inc.*, 829 P.2d at 813. In *Davis*, 855 P.2d at 348, we expanded upon the similarities between these two doctrines:

> The doctrines of promissory estoppel and equitable estoppel are closely related and, as we impliedly recognized in [*Inter–Mountain Threading, Inc. v.*] *Baker Hughes* [*Tubular Serv., Inc.*, 812 P.2d 555 (Wyo.1991) ], they often have been invoked together and interchangeably, without the benefit of clear distinction. *Baker Hughes*. *See also Roth v. First Sec. Bank of Rock Springs*, Wyo., 684 P.2d 93 (Wyo.1984). Reasonable reliance is an element common to both of these doctrines. *Baker Hughes*. Thus, we find that equitable estoppel cases are cited in promissory estoppel cases with respect to this common element. In Wyoming, these doctrines most often have been presented in the context of preliminary negotiations for commercial agreements.

*Birt*, ¶¶ 26–28, 34; *also see* 10 Williston, *A Treatise on the Law of Contracts*, §§ 27:13 and 27:14, esp. pp. 136–38 (4th ed. 1999) ("This may be little more than a recognition that the less clear an agreement, the less likely the plaintiff's reliance will be reasonable and foreseeable, and the less probable will be the injustice from refusing to enforce the agreement—concerns which influence outcomes with respect to promissory estoppel generally, and not just with respect to promissory estoppel as an exception to the Statute of Frauds.").

 We have examined these principles, and find they are inapplicable to the circumstances of this case. With respect to promissory estoppel, the Boykins failed in their burden to produce sufficient evidence of a "clear and definite" promise so as to avoid the application of the statute of frauds. It is evident that the Boykins may have acted to their detriment (though that is questionable)

in reliance on the alleged "promise," but under these circumstances we are unable to conclude that a fact finder reasonably could have concluded that such reliance was "reasonable." Finally, we are not persuaded that an injustice can be avoided only if we were to enforce the alleged "promise." Thus, as a matter of law, we conclude that the concept of promissory estoppel cannot be used to avoid the application of the statute of frauds.

 [¶ 23] With respect to equitable estoppel, we are compelled to conclude that there was insufficient evidence brought forward by the Boykins to establish that Parkhurst had persuaded them to change their circumstances to their detriment, by use of "misrepresentations" or otherwise, so as to warrant submission of that theory of recovery to the fact finder. Thus, equitable estoppel will not aid the Boykins in their effort to avoid the rigors of the statute of frauds.

[¶ 24] We hold that the district court did not err in granting partial summary judgment in favor of Parkhurst on her quiet title claims, as well as the Boykins' counter claims in that regard, and that portion of the judgment is affirmed.

## Case No. 03–193
### STANDARD OF REVIEW

 [¶ 25] The remaining issues were decided by the district court after a trial to the court. When a matter has been the subject of a bench trial before the district court, we review the factual determinations under a clearly erroneous standard and the legal conclusions *de novo*. *Union Pacific Railroad v. Trona Valley Federal Credit Union*, 2002 WY 165, ¶ 6, 57 P.3d 1203, ¶ 6 (Wyo.2002).

### The Hay

 [¶ 26] Parkhurst contends that the Boykins converted 100 bales of hay to their own use and placed a value on the hay of $700.00.[6] The parties are in agreement that the Boykins took 100 bales of hay from the ranch when Parkhurst ordered them to

---

6. Actually, the record reflects that at the time of the conversion the hay was worth about $250.00, but at the time of trial the value of hay had

increased, and 100 bales would have gone for about $700.00. The only evidence of the hay's value came from the testimony of Debbie Boykin.

leave. Parkhurst claims the hay belonged to the ranch, and the Boykins contended that they baled it using their baler and needed it to feed their horses, which had been used for work that was done to benefit the ranch. We find it sufficient to note that there was a conflict in the evidence in this regard, and the district court resolved it in favor of the Boykins. We are unable to conclude that the district court's findings are clearly erroneous. Moreover, the error, if any, is *de minimus* given these circumstances. *Odegard v. Odegard,* 2003 WY 67, ¶ 26, 69 P.3d 917, ¶ 26 (Wyo.2003) (*de minimus* error is considered harmless); *see* W.R.C.P. 61; W.R.A.P. 9.04.

**The Joint Bank Account**

[¶ 27] There is not much conflict in the evidence with respect to the joint checking account either. Parkhurst's testimony was limited to this:

Q. Ms. Parkhurst, do you have a joint account with Doug Boykin at Community First Bank?

A. I did have.

Q. Has that account been closed?

A. Yes.

Q. When was it closed?

A. Well, there was a few dollars in it after he [Boykins] took what was in—most of what was in there, and I went ahead and closed it out and I can't tell you a date, but not too awful long.

Q. You had a joint account with him prior to that?

A. Yes.

Q. What was the purpose of that account?

A. For the deposit and checks to take care of the rent and the stuff on the house that we owned jointly.

Q. Did you and Doug talk about using that account for purposes of receiving the rent and paying expenses?

A. Yes.

Q. And that was your understanding as to what the account was. And over the history of that account was that the only purpose that account was ever used for?

A. Yes.

Q. Was it ever used to pay anything, outside expenses for the house?

A. No.

Q. Was any money ever deposited into that account other than income from the house?

A. No.

Q. Do you know how much Mr. Boykin took from that account?

A. No.

[¶ 28] Doug Boykin essentially agreed with Parkhurst's testimony, and he admitted that he withdrew $7,400.00 from the account. Both Doug Boykin and Debbie Boykin also testified, without contradiction, that they used some of that money to pay for electrical repairs and possibly some taxes, but they did not know the dollar amount of those items. The remainder of those funds was used to hire an attorney to handle this matter for them. Doug Boykin intimated in his testimony that one purpose of the account was for Parkhurst to avoid paying taxes on more than 50% of the income realized from the rental property. In her brief, Parkhurst contends that she is entitled to 50% or more of the $7,400.00, but asks that we remand to the district court with directions that the Boykins reimburse her for not less than $3,700.00.

[¶ 29] Neither party provides us with anything more than scant authority on this subject. Parkhurst directs our attention to a legal encyclopedia, although the discussion there is of only limited value to her perspective on this issue:

A joint and survivorship bank account is an inter vivos contract creating a present, equal, joint-vested interest in the parties named therein, whereby either party may withdraw the funds at any time. **However, the peculiar features of a joint and several bank accounts make it difficult, if not impossible, in most cases, to determine what portion of the account belongs to each depositor.** A long series of deposits which cannot be traced to their source, and a similar series of withdrawals which cannot be traced to their destinations, are normally involved. This defect is inherent in the severalty feature of such

bank accounts wherein each depositor is allowed to treat joint property as if it were entirely his own. A joint bank account of this kind is generally a creature of contract between parties avowedly indifferent to the exact percentage of ownership between themselves. **It is said that the law should take them at their word and give effect to their contract without making detailed evidentiary inquiries to establish factual ownership. The prevailing view seems to be, however, that while joint accounts are presumed to be vested in the names as given in the deposit as equal contributors and owners in the absence of evidence to the contrary, such presumption is rebuttable, and the intention of the parties is the controlling factor.** Where a controversy arises as to the ownership of funds deposited in a joint account, evidence is admissible to show the true situation. [Emphasis added.]

10 Am.Jur.2d, *Banks and Financial Institutions* § 671 (1997).

[¶ 30] We find this description of a joint account to be helpful to our resolution of this matter:

In the case of a joint and survivorship account to which both (or all) depositors have contributed, there seems to be agreement that both (or all) depositors have a right to withdraw from the account during their mutual lifetimes. There is disagreement as to the portion of the amount standing to the credit of the account at a given time that any depositor may withdraw. **In some cases it has been held that each depositor has the right to withdraw the entire amount on deposit to use as he sees fit without accounting to any other.** In other cases, it has been stated that each depositor can withdraw only his moiety (one-half the amount on deposit in the case of two depositors), and must account for any sum withdrawn in excess of this fraction. Some courts have looked to the motive of the withdrawing depositor or to the purpose for which the withdrawal was made, holding that the right would extend to the entire amount of the deposit unless the motive or purpose is

to destroy the equal right of the codepositor. **Obviously, no universal rule can be stated for these cases. Each one must be determined by its own facts and by the precedents of the particular jurisdiction.** [Emphasis added.]

7 POF 2d 311, *Ownership of Bank Deposit Made in the Names of Two or More Persons,* § 15, at 339–40 (1975 and Supp.2001).

[¶ 31] We conclude that Parkhurst's contentions are not supported by the very limited evidence she adduced at trial, nor does the testimony of the Boykins significantly aid her contentions. Parkhurst did not include with her evidentiary submissions and testimony the materials necessary for the district court to perform an accounting of the funds at issue. The authority she relies upon in her brief indicates the "presumption" is that the whole of the account may be withdrawn by either joint depositor. It is the burden of the depositor claiming ownership of the funds to rebut that presumption. Parkhurst failed in that burden. Based on the facts available to the district court, its decision cannot be credibly challenged. For this reason, we are unable to conclude that the district court's findings were clearly erroneous, and we affirm its disposition of this issue.

## CONCLUSION

[¶ 32] The Judgment of the district court is affirmed in all respects.