2010 WY 121

Corey and Kathryn DAVISON; Ronald and Stacey Richner; and Marton Ranch, Inc., Appellants (Plaintiffs/Counter–Defendants),

v.

WYOMING GAME AND FISH COMMISSION and the Wyoming Game and Fish Department, Appellees (Defendants/Counter–Plaintiffs).

No. S–10–0007.

Supreme Court of Wyoming.

Aug. 25, 2010.

Representing Appellants: Harriet M. Hageman and Kara Brighton, Hageman & Brighton, P.C., Cheyenne, Wyoming. Argument by Ms. Hageman.

Representing Appellees: Bruce A. Salzburg, Attorney General; Jay A. Jerde, Deputy Attorney General; James Kaste, Senior Assistant Attorney General. Argument by Mr. Kaste.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Appellants (Landowners) seek reversal of the district court's decision granting summary judgment in favor of the Wyoming Game and Fish Commission and the Wyoming Game and Fish Department (collectively the Commission) in their dispute over the interpretation of an easement the Commission has over a portion of the Landowners' properties. We affirm.

## ISSUES

[¶ 2] The Landowners state their issues this way:

1. Whether the District Court erred in denying Appellants' Motion for Ruling as a Matter of Law.
2. Whether the District Court erred in denying the Appellants' Motion for Summary Judgment as to the Counterclaims.
3. Whether the District Court erred in finding that the November 20, 1964 "Permanent Easement for Public Fishing, Migratory Waterfowl Hunting, and Boat Launching," (Lusby Easement) is ambiguous; thus accepting extrinsic evidence in order to "interpret" it in a manner that is contrary to its terms.
4. Whether the Appellees can claim an easement by prescription under Wyoming law.
5. Whether the District Court erred in finding that the parties had an oral agreement to modify the Lusby Easement with regard to the location of the boat ramp.

The issues stated by the Commission can be summarized this way:

A. Does the plain language of the easement and the available extrinsic evidence show that the parties intended to grant access to the middle of the river so the public can fish, hunt, and launch boats along the easement?
B. Should this Court render an advisory opinion on the Commission's authority to acquire rights by prescription?
C. Can the landowners complain about the location of the boat launch after they asked that it be moved?

## FACTS

[¶ 3] This recitation is based largely on the statement of undisputed facts contained in the district court's decision letter. On June 17, 1964, the Commission entered into a sales contract with Clarence and Frances Lusby for an easement along the North Platte River in Natrona County, Wyoming. The contract stated that its purpose was to grant to the Commission "for the use of the

public, a permanent walking easement … for public hunting and fishing in and to the North Platte River." The contract specified that:

> Said easement shall extend from midstream of the said North Platte River outward to a point 100 feet above and beyond the high water line to the left of said river looking downstream.

The purchase price was listed as $10,000.00. The Commission received federal funding for a portion of this purchase price. In the process of obtaining the funding, the Commission certified to the Secretary of the Department of the Interior that the Commission had entered into an obligation to purchase the Easement. The certification specified that the Easement extended from the "centerline of the North Platte River."

[¶ 4] On November 20, 1964, the Lusbys executed a "Permanent Easement for Public Fishing, Migratory Waterfowl Hunting, and Boat Launching." Included in this Lusby Easement were a "walking easement," two access roadways, two parking lots, and a boat launching ramp. With specific regard to the walking easement, the Lusbys granted to the Commission:

> A permanent public walking easement, one hundred (100) feet in width, for public fishing and migratory waterfowl hunting on the North Platte River, as particularly described in the Plat and Survey by Worthington, Lenhart and Assoc., Inc., … which Plat and Survey is expressly made a part of this instrument and by reference incorporated herein.

In the Plat and Survey, the walking easement is described as: .

> A strip 100 feet in width, as measured 100 feet to the right from the right and northerly high water line of the North Platte River (as one looks upstream) and being parallel to said high water line as said river traverses the W½, Section 1 and the E½ NE¼, Section 2, T.30 N., R. 82 W. and the S½ SE¼, Section 35, T.31 N., R. 82 W. of the Sixth Principal Meridian, Natrona County, Wyoming.

The Plat and Survey then recite a detailed description, by angles and distances, of an "easement line having a total length of 10,-977.1 feet or 2.08 miles, more or less." They also include detailed descriptions of the separate easements for the two access roads, two parking lots, and boat launching ramp.

[¶ 5] After purchasing the Lusby Easement, the Commission completed its application for federal funding by certifying to the Secretary of the Department of the Interior that it had obtained "a permanent public fishing, migratory waterfowl hunting and boat launching easement." Once again, the Commission certified that the Easement extended to "the centerline of the North Platte River."

[¶ 6] The Landowners are the successors in interest to the Lusbys, and their properties remain encumbered by the Lusby Easement. In October 2007, representatives of the Commission met with some of the Landowners and other interested parties to discuss concerns, including dogs being allowed to run freely on the Easement, dust from the access roads, and slow responses by Commission representatives to the Landowners' concerns. In addition, the Landowners suggested that the wording of the Lusby Easement allowed access only to the high water line of the river, not to the middle of the river. After reviewing its documentation, the Commission sent letters to the Landowners stating its position "that the easement extends from midstream of the river outward one-hundred feet from the high water line." This disagreement over the extent of the Lusby Easement led the Landowners to file this suit on September 8, 2008.

[¶ 7] After various pretrial proceedings, the district court held a hearing on September 21, 2009, to consider cross motions for summary judgment. The district court took the matter under advisement, and issued its decision letter on October 12, 2009. It ruled against the Landowners and granted summary judgment in favor of the Commission. A final judgment incorporating the decision letter was filed on November 3, 2009. The Landowners appealed.

### STANDARD OF REVIEW

[¶ 8] This Court evaluates the propriety of a summary judgment by em-

ploying the same standards and by using the same materials as employed and used by the lower court. *Thunder Hawk v. Union Pac. R.R.*, 844 P.2d 1045, 1047 (Wyo.1992).

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo.2002). "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Id.* Because summary judgment involves a purely legal determination, we undertake *de novo* review of a trial court's summary judgment decision. *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo.2008).

*Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 8, 191 P.3d 125, 128–29 (Wyo.2008).

 [¶ 9] In this case, the parties do not dispute the material facts. Their disagreement centers on interpretation of the Easement. The district court's decision letter includes this accurate explanation of how easements are to be interpreted.

Easements are reviewed under the same principles that have been established for interpretation of contracts. *Lozier v. Blattland Investments, LLC*, 100 P.3d 380, 383–384 (Wyo.2004); *Klutznick v. Thulin*, 814 P.2d 1267, 1270 (Wyo.1991). The primary goal is to determine the intention of the parties from a close reading of the document language and by interpreting the terms of the document according to their plain and ordinary meaning. *Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC*, 185 P.3d 1259, 1261–1262 (Wyo.2008). Determination of the parties' intentions requires common sense and good faith; it also requires consideration of the context within which the contract was made. *Double Eagle Petroleum & Min. Corp. v. Questar Exploration & Production Co.*, 78 P.3d 679, 681–682 (Wyo.2003). If necessary, the reviewing court may also look to the circumstances surrounding the contract, as well as its subject matter and the purpose of the contract to glean the intent of the agreement. *Id.* Any examination of the context within which the contract was drawn is limited to ascertaining the intent of the parties in making the agreement. *Id.* The context "cannot be invoked to contradict the clear meaning of the language used, and those extraneous circumstances do not justify a court in proceeding to insert therein a provision other than or different from that which the language used clearly indicates, and thereby, in effect, make a contract for the parties." *Lozier v. Blattland Investments, LLC*, 100 P.3d 380, 383–384 (Wyo. 2004). (Internal citations omitted.)

If the language is ambiguous, then the court may use extrinsic evidence in an effort to determine the intentions of the parties. *Id.* A contract is ambiguous if it can be read in more than one way. *Dwan v. Indian Springs Ranch Homeowners Ass'n Inc.*, 186 P.3d 1199, 1202 (Wyo.2008). Whether a contract is ambiguous is a question of law for the court to decide. *State, ex rel., Arnold v. Ommen*, 201 P.3d 1127, 1137 (Wyo.2009).

## DISCUSSION

### Is the Lusby Easement ambiguous?

 [¶ 10] Applying the standard of review set forth above, we begin our analysis by examining the Lusby Easement closely to determine if it provides an unambiguous expression of the intentions of the parties, or if it is ambiguous because it can be read more than one way. The Landowners and the Commission agree that the Easement unambiguously provides that the landward boundary of the walking easement is a line located one hundred feet from the high water line of the river. It is only the streamside boundary that is in dispute. The Landowners contend that the Easement clearly and unambiguously states that the streamside boundary of the Easement is the high water line of the river. The Commission also asserts that the Easement is clear and unambiguous, but claims that it establishes the middle of the river as the streamside boundary of the walking easement.

[¶ 11] The Landowners argue that the Plat and Survey document, incorporated by reference as part of the Lusby Easement, provides "a metes and bounds legal description of the Easement, including the land encumbered and the boundaries." This description, they contend, designates the high water line of the river as the streamside boundary of the Lusby Easement. However, the description contained in the Plat and Survey is not a metes and bounds description. A metes and bounds description

> operates, in its most common format, by delineating the external boundaries of a parcel of land. The external metes and bounds of the property are recited, in serial fashion, until there is a closure with the beginning point. More specifically, the description is made up of a series of "calls," each of which is composed of (1) a course or direction and (2) a distance. When the calls finally close with the beginning point, the description is complete.

14 *Powell on Real Property* § 81A.05[2], at 81A–83 (2000). A key characteristic of a metes and bounds description is that it describes a complete boundary—the "bounds"—starting at a point of beginning and returning to that same point of beginning. "Accordingly, a description by metes and bounds, whether along natural or artificial boundaries or by courses and distances, must be by continuous lines, one commencing where the other leaves off and the final line returning to the point of beginning." III *American Law of Property* § 12.105, at 413 (1952). A deed in which "the metes and bounds description did not close on the north boundary line" is faulty. *Arndt v. Sheridan Congregation of Jehovah's Witnesses*, 429 P.2d 326, 327 (Wyo.1967).

[¶ 12] We quoted this example of a metes and bounds description in *Barrett v. Guernsey*, 652 P.2d 395, 396 n. 1 (Wyo.1982):

> Beginning at the Southwest corner of Lot 32, West Subdivision to the Town of Guernsey, Platte County, State of Wyoming, and considering the South line of said Lot 32 to bear South 89° 40' West with all bearings herein being relative thereto; thence South 89° 40' West, 138 feet to a line of old fence posts; thence North 12° 35' East, along said line of old fence posts, 40.0 feet; thence North 77° 25' West, 25 feet to a post; thence North 12° 35' East 21.5 feet; thence South 77° 25' East, 25 feet; thence North 12° 35' East, 287.33 feet; thence North 89° 40' East, 60.32 feet to the Northwest corner of said Lot 32; thence South 00° 17' East, along the West line of said Lot 32, 340.0 feet to the Point of Beginning, containing 0.8 acres more or less.

Another example can be found in the Lusby Easement, where metes and bounds descriptions are given for the two parking lots. The description of Parking Lot No. 2:

> Begin[s] at the northwesterly corner of the Parcel being described, which corner and point is located in the north line of said NE¼ NW¼, Section 1 at S. 89° 16' E., 274.7 feet from the northwesterly corner thereof; thence from said point of beginning, S. 89° 16' E., 200.0 feet along said north line of the NE¼ NW¼, to a point and northeasterly corner of said Parcel; thence S. 5° 20' E., 405.7 feet to the southeast corner of said Parcel; thence N. 89° 16' W., 200.00 feet to the southwest corner of the Parcel being described; thence N. 5° 20' W., 405.7 feet to the point of beginning and containing 1.85 acres, more or less.

Both examples describe a complete outer boundary surrounding a parcel of land, beginning and ending at the same point, and specifying the acreage of the parcel, more or less.

[¶ 13] In contrast, the Plat and Survey's description of the walking easement does not set forth the boundaries of a parcel of real property. It describes only a single "easement line" 100 feet from the high water line. The description does not begin and end at the same point. It begins "at point 1," located between Sections 1 and 36, and ends at "point 55," a different location on the boundary of Section 35. It does not describe the boundary of a parcel of land containing a specified number of acres, but rather an easement line with "a total length of 10,977.1 feet or 2.08 miles, more or less."

[¶ 14] All parties agree that this single "easement line" described in the Plat and Survey is intended to be the landward

boundary of the walking easement.[1] What is missing from the language of the Easement documents, however, is any explicit designation of the streamside boundary of the walking easement. Nowhere in the Lusby Easement is there any explicit designation of the streamside boundary.

[¶ 15] The Landowners urge us to interpret the Easement documents as specifying the high water mark as the streamside boundary. They repeatedly point out that the high water line is specifically marked on the map, and can be relocated even now based on the description provided in the Lusby Easement. While that may be true, it does not tell us whether the high water line was meant to be a boundary line, or only a reference for locating the landward side of the walking easement. Nothing in the language of the Lusby Easement answers that question. On the map included within the Plat and Survey, the high water line is marked with a light line of long dashes and three dots.[2] The boundaries of the parking lots and boat launching ramp are marked with dark lines of one long dash and two short dashes, and this same dark line is used to mark the landward boundary of the walking easement.[3] The difference between the lines is not explained on the map or elsewhere in the Lusby Easement. However, the fact that the high water line is marked differently from the other boundary lines suggests that the high water line was meant to be something other than a boundary line. What that is remains ambiguous.

[¶ 16] Both parties rely on *Glover v. Giraldo*, 824 P.2d 552 (Wyo.1992). The Commission cites the case for the rule that "Where a deed describes land bounded by a non-navigable stream and names the stream as a monument, a presumption exists that the grant extends to the center and the thread of the stream is the true boundary." *Id.* at 554. The Landowners cite it because

"The presumption is rebuttable by any words which clearly indicate an intention of the grantor to restrict the grant to the edge, shore, or some point other than the thread of the stream." *Id.* at 555. The presumption stated in *Glover* does not help the Commission, however, because the Lusby Easement does not expressly name the North Platte River as a monument or boundary. It refers only to a "permanent public walking easement, one hundred (100) feet in width, for public fishing and migratory waterfowl hunting on the North Platte River." *Glover* does not help the Landowners, either, because there are no words in the Lusby Easement indicating a clear intent to place the boundary at the edge of the river or anywhere else. The Plat and Survey refer to "A Strip 100 feet in width, as measured 100 feet to the right from the right and northerly High Water Line of the North Platte River," but never expressly states that the high water line is meant to be the boundary of the walking easement. The inherent ambiguity in the Lusby Easement is that it simply does not say what the streamside boundary of the walking easement was intended to be.

[¶ 17] The Landowners rely most heavily on the fact that the walking easement is described as "one hundred (100) feet in width" in the granting document, and as a "Strip 100 feet in width" in the Plat and Survey. Because the landward boundary of the Easement is located 100 feet from the high water line, and the walking easement is a strip 100 feet in width, the Landowners maintain that the high water line must necessarily be the streamside boundary of the walking easement.

[¶ 18] This interpretation is entirely plausible. However, as the district court recognized, the language highlighted by the Landowners must be considered in context. We interpret the Easement documents "as a

---

1. A metes and bounds description may also be in a center line format, *e.g.,* "A right-of-way having a width of 100 feet and being 50 feet on either side of a center line described as follows:...." *Powell* at 81A–85. In the Lusby Easement, the boat launching ramp easement is described in this format. It is clear, however, that the walking easement is not described in this format, and none of the parties contend that the line de-

scribed in the Plat and Survey is intended to be the center of the walking easement.

2. It looks something like this: ———— ...

3. It looks something like this: ———— ——
 —— ————·

whole, and meaning should be afforded to all of the language used by the parties if that can be done and a reasonable construction achieved." *Quin Blair Enterprises, Inc. v. Julien Const. Co.*, 597 P.2d 945, 951 (Wyo. 1979). We must, therefore, also consider the language of the Lusby Easement stating that the purpose of the walking easement is to allow "public fishing and migratory waterfowl hunting on the North Platte River."[4] This purpose is confirmed by the title of the document: "Permanent Easement for Public Fishing, Migratory Waterfowl Hunting, and Boat Launching."

[¶ 19] The Commission argues that these stated purposes would be utterly frustrated if the Landowners are correct that the streamside boundary of the walking easement is the high water line. As the district court took note, the water of the North Platte River runs as high as the high water mark only during a short time in the spring. At all other times, there will be a strip of dry land between the high water line and the water in the river. If the Landowners are correct, and the Easement is bounded by the high water line, the public has no right to cross the strip of dry land to get from the Easement to the river.

[¶ 20] As the district court wrote, "any fisherman knows[5] that it is nearly impossible to cast a fishing line, either bait, lure, or fly, across any distance of open ground to a river," or to "reel in a fish" across a strip of dry land.

In addition, if hunters were unable to have their dogs go in the river to retrieve downed birds, they would be faced with the choice of either shooting only those birds certain to fall onto the walkway, again a near impossibility, or abandoning those birds that fall into a river which, apart from the obvious ethical problems, has criminal ramifications (*Wyo. Game and Fish Commission Regulations*, Ch. 14, Sec. 4(a): No person shall wound or kill any migratory bird without making a reasonable effort to retrieve it and reduce it to possession).

[¶ 21] There is a clear conflict in the Lusby Easement between the stated width of the walking easement (100 feet) and the stated purposes of the walking easement (public fishing, migratory waterfowl hunting, and boat launching). Our decision in *Rouse v. Munroe*, 658 P.2d 74, 76 (Wyo.1983), provides useful precedent for dealing with such a conflict. In that case, Mr. Munroe had

---

4. The Landowners correctly assert that the question of whether the Lusby Easement is ambiguous must be answered based solely on the language of the easement documents, and not on extrinsic evidence. They then argue that the purpose of the easement "only comes into play if the Commission [is] first successful in establishing that the Lusby Easement is ambiguous." However, because the purpose is expressly set forth in the language of the easement, it is not extrinsic, and the district court properly considered the stated purpose in an effort to interpret the Lusby Easement.

5. The Landowners object strenuously to the district court's taking judicial notice of what "any fisherman knows." The district court cited *Fort Defiance Housing Corp. v. Lowe*, 5 Am. Tribal Law 394 (2004), for the proposition that "Judicial notice is appropriate in matters of custom and tradition." More directly applicable legal authority can be found in Wyoming cases. *E.g., TR v. LVM*, 2009 WY 76, ¶ 6, 209 P.3d 879, 882 (Wyo.2009) (quoting W.R.E. 201(b): "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned."). Judicial notice is often taken of matters of common knowledge. *E.g., Lawson v. Schuchardt*, 363 P.2d 90, 92 (Wyo.1961) ("Moreover, it is well recognized that a court is entitled to take judicial notice of climatic conditions."); *Sowerwine v. Nielson*, 671 P.2d 295, 300 (Wyo.1983) ("It is common knowledge, especially in the west where heavy snows can accumulate in the mountains, that unusual spring runoffs may substantially change the location of streams and rivers."); *Roussalis v. Wyoming Med. Ctr., Inc.*, 4 P.3d 209, 248 (Wyo.2000) ("It is common knowledge that in major projects construction costs are difficult to manage."); *Beard v. Brown*, 616 P.2d 726, 733 (Wyo.1980) ("It is common knowledge that dirt roads become dusty when traveled upon."); *Endresen v. Allen*, 574 P.2d 1219, 1222 (Wyo.1978) ("It is common knowledge that the mere presence of a dog or other animal upon a highway or street can be a serious distraction to, and even interference with, traffic"). The district court did not err in taking judicial notice of the fact that the North Platte River often runs below the high water line, or the fact that it would be difficult to fish or hunt without access to the stream bed.

granted Mr. Rouse an easement that was described as covering "approximately 10 acres, more or less." The stated purpose of the easement was to allow Mr. Rouse to construct a dam "for the purpose of a stock water reservoir and in accordance with [the] application dated September 26, 1955 which is on file in the State Engineer's Office." *Id.* The referenced application proposed a dam with the high-water line 17 feet above the creek bottom and a capacity of 162.9 acre feet of water. When the dam was constructed, the resulting reservoir was not 10 acres, as described in the easement, but more than 15 acres. Mr. Munroe sought to enjoin Mr. Rouse from flooding any more than 10 acres of his land.

[¶ 22] We noted that our basic purpose was to "determine the intent of the parties as embodied in the instrument, just as we are asked to do in any other case involving the construction of a contract." *Id.* at 77. We then said:

> The parties to this appeal both contend that the easement agreement is clear on its face and that the intent of the parties can be determined from within the four corners. With this contention we cannot agree. From our viewpoint, the language contained in the easement agreement can be read in two ways. First of all, the contract can be read to provide an easement for the construction and maintenance of a stock-watering reservoir with a capacity water level of 17 feet above the creek bottom at the dam site. From another point of view, the contract can be read to provide for an easement of ten acres of land for the purpose of inundating that area for maintenance of a stock-watering reservoir. Given this double meaning, we believe it is necessary to resort to extrinsic evidence in order to determine the actual intent of the contracting parties.

*Id.* at 78. Based on the extrinsic evidence in that case, we concluded that the intent was to establish a reservoir with a capacity of 162.9 acre feet, and that the use of "the '10 acres, more or less' language by the parties was merely an estimation on their part of the amount of acreage that would be inundated." *Id.*

[¶ 23] Applying similar reasoning here, we conclude that the Lusby Easement is ambiguous. First, the language can be read to establish an easement for the purpose of fishing and migratory waterfowl hunting, with its streamside boundary at the middle of the river. From another point of view, the language can be read to establish a walking easement 100 feet in width with the streamside boundary at the high water line. Giving effect to both readings is impossible. We therefore agree with the district court that the "inconsistency between the seemingly restricted walk way for fishermen and hunters on one hand, and, on the other hand, the expressed intent within the easement to allow fishing and migratory bird hunting ... creates an ambiguity within the easement."

### Interpreting the Lusby Easement using extrinsic evidence

[¶ 24] The Commission points out that all of the documents contemporaneous with the Lusby Easement indicate that the walking easement was intended to extend to the middle of the river. The most telling of these documents is the sales contract. It unambiguously states that the Easement "shall extend from midstream of the said North Platte River outward to a point 100 feet above and beyond the high water line."

[¶ 25] The Landowners contend that "[t]he fact that the parties chose not to use the language of the sales contract [in the Easement documents] speaks volumes—they changed their minds." This contention is undermined by the Commission's certifications to the Secretary of the Department of the Interior. Two certifications were submitted as part of an application for federal funding of part of the purchase price, the first soon after the sales contract was executed, and the second soon after the Easement documents were executed. Both certifications clearly reflect the Commission's understanding that the middle of the river was intended to be the boundary of the walking easement.

[¶ 26] The Landowners claim that the sales contract cannot be used to help interpret the Easement documents because, under the doctrine of merger, the Easement

documents are controlling over the sales contract. In support of this claim, they cite *Bixler v. Oro Management, L.L.C.*, 2004 WY 29, ¶ 14, 86 P.3d 843, 848 (Wyo.2004), in which we stated that "the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable." (Quoting *Hansen v. Stichting Mayflower Recreational Fonds*, 898 F.Supp. 1503, 1515 (C.D.Utah 1995).) They also rely on *Sowerwine v. Keith*, 997 P.2d 1018, 1020 (Wyo.2000), in which we stated that "All conversations, contemporaneous negotiations, and parol agreements between the parties that occurred prior to the written agreement are merged into the written agreement."

[¶ 27] The flaw in the Landowners' claim is exposed when the language from *Sowerwine* is placed in context:

> When contract provisions are not ambiguous or uncertain, the document speaks for itself. With an unambiguous agreement, we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the document. All conversations, contemporaneous negotiations, and parol agreements between the parties that occurred prior to the written agreement are merged into the written agreement. *We turn to extrinsic evidence and rules of contract construction only when the contract language is ambiguous and its meaning is doubtful or uncertain.*

*Id.* (Emphasis added and internal citations omitted.) Because the Lusby Easement deed is ambiguous, the merger doctrine does not preclude us from considering the extrinsic sales contract as an aid in interpreting the deed language.

[¶ 28] The Commission submitted affidavits from several witnesses attesting that they have observed fishermen and hunters wading into the river at the Lusby Easement for many years. The district court found that these affidavits constituted "ample evidence that it has been the long-standing custom for fishermen to wade into the river from the bank and to fish offshore," and concluded that, "If the parties wanted the public restricted in the manner proposed by [the Landowners], one would think the Lusbys would have objected to the fishermen wading." We note, however, that the Lusbys sold their property in 1971. The affidavits refer to wading in the river only as far back as the early–1970's, which provides little insight into the parties' intentions in 1964 when the Lusby Easement was granted.

[¶ 29] Even disregarding the affidavits, however, we find that the sales contract and the Commission's certifications firmly establish that the Lusby Easement was meant to extend to the middle of the river.[6] As pointed out by the district court, the Landowners "presented no evidence on this point," but instead rely solely on their position that the language of the Easement is plain and unambiguous. Given the absence of any genuine issue of material fact and our agreement with the district court's conclusion that the Commission was entitled to judgment as a matter of law, we affirm the district court's grant of summary judgment in favor of the Commission.

*Prescriptive Easement*

[¶ 30] Because we affirm the district court's grant of summary judgment in favor of the Commission, there is no reason for the Commission to pursue a claim of prescriptive easement, and no need for us to consider the Landowners' contention that the Commission cannot claim a prescriptive easement under Wyoming law.

*Location of the Boat Launching Ramp*

[¶ 31] All parties agree that the Lusby Easement's description of the boat launching ramp is clear and unambiguous.

---

6. The Landowners also object to the interpretation that the boundary for the easement is the middle of the river because "there is no way to determine where that 'middle of the river' is located." We note, however, that it is not uncommon to designate the middle of a stream as the boundary of a parcel of land. *See, e.g., Glover*, 824 P.2d at 554–55. In fact, when the

Wyoming Territorial Legislature established Sheridan County in 1888, it specified "the center of the channel of the Big Horn River" as one of its boundaries. *See Board of County Comm'rs of Crook County v. Board of County Comm'rs of Sheridan County*, 17 Wyo. 424, 435, 100 P. 659, 662 (Wyo.1909).

It is also undisputed that the ramp was initially constructed in the specified location, but was later moved to a different spot. The Landowners sought an injunction requiring the Commission to remove the current boat ramp, reclaim the area, and reconstruct the ramp in the location specified in the Lusby Easement. In response, the Commission explained that it had moved the boat ramp at the request of Mr. Davison. The Davisons own the property on which the old boat ramp was built, and on which the present ramp is located.

[¶ 32] The Commission supported its explanation with the affidavits of several employees. Mr. Kofron stated in his affidavit that:

> In approximately 2005, a lawyer representing Mr. Davison, contacted the [Commission] requesting that the boat launch be moved to a different, but nearby location because, in part, the platted boat launch area was too close to Mr. Davison's house. Myself and Al Conder met with Mr. Davison and his attorney. In addition to the request to move the boat launch area, Mr. Davison's lawyer also requested that boulders be positioned to prevent driving on his property, and that signs defining the landward side of the easement be created and affixed. The [Commission] accommodated Mr. Davison's request, at the [Commission's] expense.

Mr. Conder's affidavit was consistent with Mr. Kofron's, and provided this additional information:

> After that meeting, neither the Davisons, nor the attorney we met with, ever communicated any concern or complaint regarding the work that was done to move the boat launch (and signs), and close the old boat launch. Until this litigation began it appeared as if the [Commission] had done exactly as Mr. Davison and his attorney had wanted for the boat ramp.

The affidavit from Mr. DeBerard indicated that he was involved in the physical work of moving the boat launch ramp:

> On September 27, 2005, we were out on the job site, we were talking about how we wanted the jobsite to look and Mr. Davison [waved] us over. Mr. Davison asked us

several questions about signs on the easement and the easement boundary. Mr. Davison did not ask any questions, nor did he express any concern, about the work we were doing on the new and old boat launch areas. He seemed excited about the new boat launch area as he stated that the previous area seemed to invite unwanted trespass onto his lot. We closed off the old launch with boulders so no one could park there in the future.... The [Commission] spent $2,116.72 on the Lusby job, including the cost of the materials (including boulders), and employee time.

[¶ 33] Based on these facts, the Commission contended that Mr. Davison's claim was barred by the doctrine of promissory estoppel. It listed the elements of promissory estoppel as: "a clear and definite agreement; proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and the equities support the enforcement of the agreement." *Loghry v. Unicover Corp.*, 927 P.2d 706, 710 (Wyo. 1996). Applying this theory to the facts established in the employees' affidavits, the Commission maintained that it was entitled to judgment as a matter of law on this claim.

[¶ 34] After oral argument on the parties' cross motions for summary judgment, the district court first noted the undisputed facts that Mr. Davison had "requested that the ramp be moved," and that the Commission had "accommodated this request at a cost of $2,116.72." The district court then wrote:

> Now [the Landowners], particularly Davisons, have asserted a claim for trespass because the public is using the new boat ramp. At oral argument, the [Landowners] argued that the written easement agreement could not be changed by an oral agreement. It is not clear, but I assume this is a reference to the statute of frauds, Wyo. Stat. Ann. § 1–23–105(a)(v).
>
> If the [Landowners] are contending that they are not bound by their agreement to move the boat ramp, they cannot rely on the statute of frauds because of the complete performance of the agreed modification. Wyoming has recognized that either full or part performance of a contract in-

volving land will avoid the statute of frauds defense. *Parkhurst v. Boykin,* 94 P.3d 450, 458 (Wyo.2004). The modification may also be enforceable on the basis of promissory estoppel. *Linton v. E.C. Cates Agency, Inc.,* 113 P.3d 26, 32 (Wyo.2005).

In this case, application of either exception defeats the [Landowners' claim]. There is no question that the new boat ramp has been constructed and is in use. Therefore, there is complete performance of this agreement. In addition, the required elements of promissory estoppel have been met: (1) the existence of a clear and definite agreement; (2) proof that the party urging the doctrine acted in reasonable reliance on the agreement; and (3) equities supporting the enforcement of the agreement. *Baker v. Ayres and Baker Pole and Post, Inc.,* 170 P.3d 1247, 1250 (Wyo.2007). Again, the evidence is not in dispute. The parties had an agreement to move the ramp. The [Commission] moved the ramp reasonably relying on Davison's request and the agreement of the parties to move the location of the ramp. Finally, the [Commission] expended money, manpower, and time to move the ramp solely to accommodate the Davisons. The equities strongly favor enforcement of the agreement to move the ramp.

[¶ 35] When the Commission moved for summary judgment, it had the "initial burden of establishing a *prima facie* case for summary judgment by showing that no genuine issue of material fact exists." *Alloway v. RT Capital, Inc.,* 2008 WY 123, ¶ 7, 193 P.3d 713, 715 (Wyo.2008); *Boehm v. Cody Country Chamber of Commerce,* 748 P.2d 704, 710 (Wyo.1987). With the facts established in the Commission's affidavits, discussed above, the Commission carried that burden. The burden then shifted to the Landowners to "present specific facts to demonstrate a genuine issue of material fact exists." *Alloway,* ¶ 8, 193 P.3d at 715; *Hatton v. Energy Electric Co.,* 2006 WY 151, ¶ 9, 148 P.3d 8, 12 (Wyo.2006).

After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings ..., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden.

*Alloway,* ¶ 8, 193 P.3d at 715, quoting *Cook v. Shoshone First Bank,* 2006 WY 13, ¶ 12, 126 P.3d 886, 890 (Wyo.2006).

[¶ 36] In their brief to this Court, the Landowners assert that "Mr. and Mrs. Davison disagree with the [Commission's] rendition of what occurred in relation to the ... decision to move the boat launch ramp." However, the Landowners never provide their version of what occurred. More importantly, they do not provide a single citation to the record providing any factual support for their disagreement with the Commission's rendition of what occurred. The district court was correct in ruling that there are no genuine issues of material fact with regard to the relocation of the boat ramp.

[¶ 37] As to whether the Commission was entitled to judgment as a matter of law, we note initially that the Landowners have not raised the statute of frauds in their brief to this Court. Either the district court wrongly interpreted their argument, or the Landowners have abandoned it on appeal. Either way, it is now the law of this case that the statute of frauds, Wyo. Stat. Ann. § 1–23–105(a)(v) (LexisNexis 2009), provides no basis for denying the Commission's motion for summary judgment.

[¶ 38] The crux of the Landowners' legal argument on appeal is that, "Because the Commission ... had no legal authority to move the ramp, [the] 'facts' are largely unimportant." They then assert that, because the Lusby Easement was "purchased in part with federal-aid monies there are certain requirements and steps that must be met before any disposal or exchange of property rights can take place." They do not provide a single citation to any legal authority for this proposition. They claim that a Commission employee, Alan Bott, "identified all of

the issues that would first need to be addressed in order for such a change to be carried out." They list a number of such issues. However, their citation to the record "*See* R1354." leads to a fee schedule that is an attachment to the Landowners' expert witness designation for Steve M. Castle and Don A. Davis. It contains no mention of Mr. Bott, of any issues involved in a land exchange, or of any requirements relating to federal funds.

[¶ 39] When a party fails to provide pertinent legal authority, cogent argument, or factual support for an issue, we cannot provide meaningful review. *See Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 25, 180 P.3d 895, 903 (Wyo.2008). We are unable to discern the factual or legal basis of the Landowners' argument on this issue and will not consider it further.

[¶ 40] Finally, in light of our conclusion that the district court properly granted summary judgment in favor of the Commission, we need not address the first two issues presented by the Landowners.

[¶ 41] Affirmed.